THOMAS O'GRADY, JAMES R. PRIDEMORE, PETER MacQUEEN, III, AND MARY G. MacQUEEN, PLAINTIFFS v. FIRST UNION NATIONAL BANK OF NORTH CAROLINA, DEFENDANT AND THIRD PARTY PLAINTIFF AND BANK OF NORTH CAROLINA, N.A. DEFENDANT v. JACK F. STEWART AND WAYNE C. HUDDLESTON, THIRD PARTY DEFENDANTS

No. 25

(Filed 29 December 1978)

1. **Bills and Notes § 19— rescission of unconditional guaranty—evidence of condition—parol evidence improperly excluded**

    In an action to rescind an unconditional guaranty, the trial court erred in excluding parol evidence of a condition precedent to plaintiffs' liability on the ground that plaintiffs did not expressly communicate the alleged condition to defendant, and plaintiffs established a prima facie case for the invalidity of the guaranty agreement where the evidence tended to show that defendant requested that one plaintiff fill out a guaranty form to secure a note; plaintiff did not fill in the names of the primary obligors, but left that to defendant; the parties expressly agreed that the guaranty would conform to the note; the guaranty was to secure the obligation of those principally liable on the note; by requesting that the wife of one of the makers sign the note along with the other makers, defendant led plaintiffs to believe that she was a maker on the note; that the wife was a maker on the note was clear from the face of the instrument, as she had signed it on the bottom righthand corner among the signatures of the makers; defendant's own actions put it on notice as to plaintiffs' intentions regarding those whose obligations the guaranty was to secure; having such notice, defendant had the duty to include the wife among the primary obligors of the guaranty form; and defendant failed to do this, contrary to the parties' general agreement and the plaintiffs' implicit authorization stemming from this agreement.

2. **Guaranty § 1— omission of obligor on note from guaranty form—agreement by guarantor—question of fact**

    In an action to rescind a guaranty agreement, a question of fact existed and was not resolved by the trial court as to whether one plaintiff implicitly

O'Grady v. Bank

agreed to and authorized the omission from the guaranty agreement of a primary obligor on the note which the guaranty was to secure where plaintiff contended that he never saw the guaranty agreement, which he had signed in blank, after it had been filled out, but an employee of defendant testified that he inserted the obligors' names on the guaranty form in the presence of plaintiff.

3. **Principal and Agent § 5.2— power of attorney—note signed without authority—principal not liable**

A person signing a note under power of attorney did not have authority to do so and his principal was not liable on the note merely by virtue of the agent's signature where the agent's power was limited to transactions concerning property in Robeson County alone; the uncontested evidence showed that the note in question was signed to procure funds for properties in S.C. and Rocky Mount as well as in Robeson County; and defendant could not claim that the principal was liable by virtue of the agent's apparent authority, as the agent's authority was in writing and defendant was deemed to have notice of the nature and extent of such authority.

4. **Guaranty § 1— joint debts of obligors covered—individual debts not covered**

Defendant's contention that a guaranty executed by two plaintiffs covered not only the joint debts of the three men listed as primary obligors, but also applied to the individual debt of any one of those primary obligors was without merit, since the guaranty agreement itself contained no specific provision stipulating or clearly indicating that the guaranty extended to the individual debts of each person listed as an obligor; the guaranty explicitly provided that the three men denominated "primary obligors" should be "hereinafter collectively termed 'Customer' "; and "Customer" was used throughout the instrument in the singular.

5. **Guaranty § 1; Principal and Agent § 6— agent's action without authority— ratification—question of fact—effect of ratification on guaranty**

A question of fact existed as to whether a principal ratified his agent's unauthorized signature on a note by taking control of proceeds of the loan in question with knowledge of the source of those proceeds and with knowledge that his agent had signed his name to the note; if the principal did ratify his agent's signature, then there were three makers of the note who were jointly and severally liable, and plaintiffs could be held liable on their guaranty which applied to the collective debts of those three makers. G.S. 25-3-404(2).

6. **Uniform Commercial Code § 36.1— letter of credit—existence of condition—communication of condition**

A question of fact existed as to whether a condition of one plaintiff's issuing a letter of credit would be the liability of two named persons on the principal debt, and a question of fact existed as to whether the alleged condition regarding the applicability of the letter of credit was communicated to defendant bank.

7. **Uniform Commercial Code § 36.1— guaranty letter of credit—description**

A guaranty letter of credit is a term used to describe a transaction in which a letter of credit is used to accomplish the ends of a contract of guaran-

ty or suretyship, and in such transactions the letter functions to secure per-
formance of an obligation.

**8. Uniform Commercial Code § 36.1— letter of credit—requirements**

To be a letter of credit an instrument must satisfy the requirements of
G.S. 25-5-103(1)(a), and, in addition, must be in writing and signed by the
issuer; no consideration between customer and issuer is necessary.

**9. Uniform Commercial Code § 36.1— letter of credit—independent of underlying
contract—duty to honor documents thereunder—exceptions**

Since a letter of credit is essentially a contract between the issuer and the
beneficiary, it is recognized by Article 5 of the Uniform Commercial Code as
being independent of the underlying contract between the customer and the
beneficiary, and the only exceptions to the issuer's duty to honor documents
which on their fact comply with the terms of the credit are: (1) the failure of
certain documents to conform to certain specified warranties, (2) the present-
ment of forged or "fraudulent" documents, and (3) "fraud in the transaction."
G.S. 25-5-114(2).

**10. Uniform Commercial Code § 36.1— letter of credit—conditions for injunction
against honor**

An injunction should issue to enjoin payment of a draft on a letter of
credit only in those instances where there is some action by the beneficiary
which vitiates the transaction between the beneficiary and the issuer, and,
since the transaction between the beneficiary and the issuer is one consisting
of an exchange of documents, only some defect in these documents would
justify an injunction against honor.

**11. Uniform Commercial Code § 36.1— letter of credit—exception to duty to
honor—fraud in the transaction**

"Fraud in the transaction" under G.S. 25-5-114(2), providing for the excep-
tions to the issuer's duty to honor documents which on their face comply with
a letter of credit, refers to the beneficiary's accompanying his draft with
documents or declarations which have absolutely no basis in the facts of the
underlying performance; since the documents in this case, a note and notice of
default, did reflect the nature of the underlying performance and default, there
were no grounds for a claim of fraud in the transaction.

**12. Uniform Commercial Code § 36.1— letter of credit—exception to duty to
honor—fraudulent document defined**

A fraudulent document within the meaning of G.S. 25-5-114(2) is
presumably one that is completely forged or drawn up without any underlying
basis in fact, one that is but partly spurious or a document which has been
materially altered.

**13. Uniform Commercial Code § 36.1— letter of credit—presentment of fraudulent
documents**

The knowing and intentional attachment of a guaranty letter of credit, as
collateral security, to a negotiable instrument which that letter was not intend-
ed to secure, and the eventual presentation of these documents to the issuing

O'Grady v. Bank

bank for purposes of honor of the letter of credit, would amount to a present-ment of fraudulent documents under G.S. 25-5-114(2).

14. **Uniform Commercial Code § 36.1— letter of credit—condition—question of fact as to whether notice given—presentment of fraudulent documents**

In an action to rescind an irrevocable letter of credit, if the trial court finds on retrial that an agent gave notice of one plaintiff's condition for issuing the letter of credit in the presence of bank officials, that such notice was directed to bank officials, and that bank officials had knowledge of this condi-tion, then the presentment of the note and notice of default to defendant bank for purposes of drafting on the letter of credit would be a presentment of fraudulent documents, and plaintiff would be entitled to a permanent injunc-tion and cancellation of the letter of credit.

15. **Bills and Notes § 20— agent signing note on behalf of principal and himself—liability**

Contention by one plaintiff that his signing of a note was conditioned on the comakers' liability on that note, and since the comakers were not liable, the note could not be binding on him either is without merit, since plaintiff alone signed the note in question both for himself and in his capacity as agent for the comakers; plaintiff's allegation that he was not bound on the note because the wife of a comaker was not made a party cannot be sustained for the reason that he, signing the note in the presence of bank officials with full knowledge that she was not listed as a principal on the note, did not insist that she be made a party to the note; plaintiff cannot secure release from liability by virtue of the fact that a comaker's signature on the note was not binding on the comaker, since plaintiff himself affixed the comaker's signature to the note under the impression that he had authority to do so; and plaintiff was liable on his signature of his own name on the note.

Justice BRITT took no part in the consideration or decision of this case.

ON plaintiffs' petition for discretionary review of the decision of the Court of Appeals, reported in 35 N.C. App. 315, 241 S.E. 2d 375, which affirmed judgment entered by *James, J.*, at the 23 August 1976 Session of NEW HANOVER Superior Court, dismissing plaintiffs' action and granting First Union National Bank judg-ment against plaintiffs on its counterclaim.

This action was filed on 11 August 1975 by Thomas O'Grady to rescind an irrevocable commercial letter of credit in the amount of $26,000, by plaintiffs Peter MacQueen, III, and Mary G. MacQueen to rescind as unconditional guaranty of $7,500, and by plaintiff James R. Pridemore to rescind his execution of a negotiable note of 9 April 1975, all on grounds that defendant First Union National Bank (First Union) had relieved Jack and Flora Stewart of their liability on a debt upon which Pridemore

was primarily liable and for which O'Grady and the MacQueens had provided collateral security. The Bank of North Carolina, N.A., issuer of the letter of credit sought to be rescinded, was also made a defendant. The defendant First Union answered and counterclaimed for judgment against plaintiff O'Grady upon the letter of credit; against plaintiffs Peter and Mary MacQueen upon their guaranty; and against plaintiff Pridemore upon his liability on the note. The letter of credit and guaranty represented collateral security for a loan in the principal amount of $45,000. First Union also filed a third-party complaint against Jack F. Stewart and Wayne C. Huddleston, both of whom had entry of default and judgment by default entered against them.

At the call of the case, all of the parties, by consent, waived a trial by jury, and the case was heard by the trial judge. The evidence presented tended to show that Jack Stewart, Wayne Huddleston, and James R. Pridemore were developers of motels in Rocky Mount and Rowland, North Carolina, and in Florence, South Carolina. The men were in need of construction funds, and requested the defendant First Union to make a loan of $45,000 to them. The defendant bank agreed to do as much upon its receiving proper security for the loan. The negotiations relating to the loan culminated in the initial signing of a note, dated 3 April 1975, by Jack Stewart, Flora Stewart, James Pridemore, and Wayne C. Huddleston through his attorney in fact, Pridemore. Jack Stewart, Pridemore, and Huddleston were shown on this note as primary obligors. The loan proceeds were not disbursed as a result of the signing of the 3 April 1975 note, as the requested collateral security for the note had not been received by the defendant bank.

Thereafter, plaintiff O'Grady caused the Bank of North Carolina, N.A., to issue a letter of credit in favor of First Union in the amount of $26,000, and plaintiffs MacQueen executed and delivered to First Union their guaranty in the amount of $7,500. On 9 April 1975, plaintiff Pridemore went to First Union offices in Rocky Mount to obtain the proceeds from the loan. The 3 April note was a three-year note, and bank officials discovered that the letter of credit only extended for one year. Thus, a new note was prepared containing a one-year repayment provision. The new note, dated 9 April 1975, was executed by Jack F. Stewart, Wayne C. Huddleston, and James R. Pridemore as primary

O'Grady v. Bank

obligors, and was signed by James R. Pridemore personally, and by Wayne C. Huddleston and Jack Stewart through their attorney in fact, Pridemore. First Union thereupon disbursed the loan proceeds of $45,000 to Pridemore by means of its check made payable to Stewart, Pridemore, and Huddleston. Said check was negotiated by Pridemore by his endorsements in the same manner, personally and through his powers of attorney, as he had executed the 9 April note.

Sometime later, after but two payments had been made on the note, the principals defaulted. Plaintiffs then instituted this action, seeking cancellation of the various instruments. In addition, plaintiff O'Grady applied for and was granted a preliminary injunction, enjoining Bank of North Carolina from honoring First Union's draft on the letter of credit.

At the close of plaintiffs' evidence defendant First Union moved, pursuant to G.S. 1A-1, Rule 50, for entry of directed verdict against each of the plaintiffs, dismissing their complaint on grounds that they had shown no right to relief. Defendant further moved for directed verdict in its favor for judgment on its counterclaims against each of the plaintiffs, on grounds that plaintiffs' liabilities had been established by their own pleadings and evidence. These motions were denied and defendant presented evidence. At the conclusion of this evidence, the defendant renewed its motions for directed verdicts against the plaintiffs and for entry of a directed verdict in defendant's favor on its counterclaims. The trial judge, after finding that there were no factual disputes as to the matters of law raised by the pleadings and the evidence, concluded that plaintiffs had no right to the relief requested, and ordered their complaint dismissed. The trial judge further found that the undisputed facts of the case entitled defendant to judgment in its favor on its counterclaims against Mr. Pridemore, Mr. and Mrs. MacQueen and Mr. O'Grady. Plaintiffs appealed and the Court of Appeals affirmed.

*Crossley & Johnson by Robert White Johnson for plaintiff appellants.*

*Parker, Rice & Myles by Charles E. Rice, III for First Union National Bank of North Carolina, defendant appellee.*

MOORE, Justice.

The case was tried in the absence of a jury. A Rule 50(a) motion for directed verdict is appropriate only to a case tried before a jury. In non-jury trials Rule 41(b), Involuntary Dismissal, provides for a procedure whereby, at the close of the plaintiff's evidence, the judge can give judgment against the plaintiff, not only because his proof has failed to make out a case (as is permitted under Rule 50), but also on the basis of facts as the judge may then determine them. *See Helms v. Rea*, 282 N.C. 610, 194 S.E. 2d 1 (1973). In *Helms v. Rea, supra*, Justice Sharp (now Chief Justice) noted that if the trial judge defers ruling on a Rule 41(b) motion until the close of all the evidence, there would be little point for counsel to renew the motion, for at that stage of a non-jury trial the judge must, pursuant to Rule 52, determine the facts in any event. Whether the trial judge decides the case on a motion for dismissal or at the close of all the evidence, he must, as required by Rule 52, separately make findings of fact, state his conclusions of law, and enter judgment accordingly. *See Helms v. Rea*, 282 N.C. at 619. *See also Hinson v. Jefferson*, 287 N.C. 422, 215 S.E. 2d 102 (1975); Wright, Law of Federal Courts, sec. 96, at pp. 477-78 (1976). Though the trial judge in present case ruled under Rule 50, we will consider his findings and judgment as an adjudication on the merits under Rule 52.

The trial judge failed to make findings of fact as required by Rule 52. Instead, in his conclusions, he ruled that "there are no factual disputes as to the matters and issues of law raised by the pleadings and evidence in this case." In light of certain conflicting evidence in the record, this ruling was erroneous. Due to the trial court's failure to find facts concerning this conflicting evidence, and because of its failure to admit and weigh other evidence sought to be introduced by the plaintiffs, a new trial will be required.

Under their first assignment of error plaintiffs O'Grady and MacQueen argue that the trial court erred in refusing to allow the plaintiffs to testify that the collateral security which they furnished was contingent upon Jack and Flora Stewart's being liable on the debt. The plaintiff, O'Grady, would have testified, if permitted, that he ordered the letter of credit issued only on condition that the Stewarts remain liable on the note. Plaintiffs Mac-

Queen would have testified, if permitted, that they executed the guaranty agreement on the same condition. The Court of Appeals upheld the trial court's rulings on grounds that parol evidence will be admitted to prove a condition precedent only when such condition is communicated to the obligee of the contract, and that, since the evidence shows that O'Grady and the MacQueens did not expressly communicate the alleged condition to defendant First Union, the trial court properly excluded plaintiffs' testimony.

The opinion by the Court of Appeals correctly and succinctly summarizes the law concerning the admissibility of parol evidence to prove the existence of prior conditions which would render an executed written contract inoperative or unenforceable due to failure of occurrences of conditions precedent. *See Lane v. Coe*, 262 N.C. 8, 136 S.E. 2d 269 (1964); *Bailey v. Westmoreland*, 251 N.C. 843, 112 S.E. 2d 517 (1960); *Perry v. Trust Co.*, 226 N.C. 667, 40 S.E. 2d 116 (1946); *Overall Co. v. Hollister Co.*, 186 N.C. 208, 119 S.E. 1 (1923); Wigmore on Evidence, § 2410 (3d Ed.); Stansbury, North Carolina Evidence § 257 (Brandis rev. 1973). We must, however, take issue with the Court of Appeals' application of that law to the facts of this case.

We first consider the document entitled "Unconditional Guaranty" signed by Peter and Mary MacQueen. According to the uncontested evidence, Peter MacQueen was present on 3 April at the signing of the note of that date. He witnessed the signatures of Jack and Flora Stewart, James Pridemore, and Wayne Huddleston to the note. It was agreed that MacQueen would guarantee the note of 3 April to the extent of $7,500, and bank officials gave him a guaranty form, instructing him to sign it and return it to the Wilmington office. On 8 April both MacQueen and his wife signed the document and filled in the amount of $7,500. They left the section at the top of the form, headed "Primary Obligor(s)," blank. This document was then delivered to Robert Helms at First Union in Wilmington. Mr. Helms testified that in the MacQueens' presence he wrote in the names "Jack F. Stewart, James R. Pridemore, Wayne C. Huddleston." The Mac-Queens testified that the names of the primary obligors were not inserted in their presence, and that, based on their observations of the four people signing the note on 3 April, they intended to guarantee a loan to those four people only. Mr. MacQueen,

however, admitted that he had not expressly told anyone at First Union that he would guarantee a loan only to the four people signing the note of 3 April.

The MacQueen guaranty is a continuing guaranty of payment. A guaranty is a promise to answer for the payment of some debt, or the performance of some duty, in case of the failure of another person who is himself liable in the first instance for such payment or performance. *Cowan v. Roberts*, 134 N.C. 415, 46 S.E. 979 (1904). A guaranty of payment, as opposed to a guaranty of collection, is an absolute promise to pay the debt of another at maturity if not paid by the principal debtor. *Investment Properties v. Norburn*, 281 N.C. 191, 188 S.E. 2d 342 (1972). The right to sue upon an absolute guaranty of payment arises immediately upon the failure of the principal debtor to pay at maturity. *Milling Co. v. Wallace*, 242 N.C. 686, 89 S.E. 2d 413 (1955). Whereas a guaranty which covers a single debt is specific, a guaranty which covers a series of extensions of credit or a succession of transactions is continuing. *Novelty Co. v. Andrews*, 188 N.C. 59, 123 S.E. 314 (1924). *See* Simpson on Suretyship, § 6 (1950); Lee, N.C. Law of Suretyship, § 2 (5th Ed. 1977).

Though a special law of guaranty has developed to answer specific problems inherent in these sorts of agreements, contracts of guaranty are subject to the more general law of contract when not otherwise provided. The signing of a blank or incomplete guaranty form is a matter controlled by the law of contract.

Plaintiffs MacQueen argue that the guaranty agreement signed by them is not binding because Mrs. Stewart's name is not included among the guaranty's "primary obligors," those persons whose debts the agreement guaranteed. They further argue that, if the guaranty is valid, then it cannot be applied to cover a default on the note of 9 April, since Jack Stewart is not liable on that note due to plaintiff Pridemore's unauthorized signature. Defendant First Union argues that the guaranty is valid, for it was never expressly told that Mrs. Stewart had to be listed as a primary obligor on the guaranty. First Union further argues that the guaranty applies to the note of 9 April even though Mrs. Stewart did not sign, and even though Jack Stewart may not be liable on that note (which it does not admit), for the guaranty, by

its terms, applies to both the collective and individual debts of the primary obligors.

[1]   We deal first with the question of the validity of the guaranty agreement. It is clear that a valid contract may be signed in blank and substantial terms filled in at a later date at the direction of the signer. On the other hand, it has been held that, where no delegation of authority is conferred to supply a defect, a signature to an incomplete paper or contract does not bind the signer without further assent on his part to a party's completion of the instrument. *Richards v. Day*, 137 N.Y. 183, 33 N.E. 146; *Campbell v. WABC Towing Corp.*, 356 N.Y.S. 2d 455, 78 Misc. 2d 671. *Cf. Bank v. Corbett*, 271 N.C. 444, 156 S.E. 2d 835 (1967). Furthermore, when there has been a delegation of authority to complete essential terms of an instrument pursuant to an understanding regarding those terms, a party's completion of terms that is contrary to the signer's authorization is not, between the parties, binding on the signer. *See Regal Music Co. v. Hirsch*, 183 N.Y.S. 2d 474, 16 Misc. 2d 365; *Reilley Bros. v. Thompson*, 127 Neb. 683, 256 N.W. 642; *C.I.T. Corporation v. Glennan*, 137 C.A. 636, 31 P. 2d 430. *See also* 17 Am. Jur. 2d, Contracts § 73. (*Cf. Creasman v. Savings & Loan Assoc.*, 279 N.C. 361, 183 S.E. 2d 115 (1971), where a different rule applies to the signing of blank instruments when the rights of third parties are involved.) These rules follow from the more general principle of contract that, in order that there may be a valid and enforceable contract between parties, there must be a meeting of the minds of the contracting parties upon all essential terms and conditions of the contract. *See Horton v. Refining Company*, 255 N.C. 675, 122 S.E. 2d 716 (1961); *Elks v. Insurance Co.*, 159 N.C. 619, 75 S.E. 808 (1912).

In present case Mr. MacQueen, if permitted, would have testified that a condition of his executing a conditional letter of endorsement was that Jack and Flora Stewart remain liable on the note, or loan, of 3 April. Mr. MacQueen did testify that he intended to guarantee the joint debt of all those who signed the note of 3 April in his presence, including Mrs. Stewart. At trial he stated:

"As to whether I told anybody at First Union National Bank, specifically Randy Evans or Lloyd Davis, the commercial loan officers, that I would guarantee a loan only to these

four people—Jack Stewart and his wife, Flora, James Pridemore and Wayne Huddleston, I say indirectly, yes, because they had already signed the note. As to whether I directly and specifically said that, I say it was never mentioned. They just said you have to have a guaranty of $7,500.00 for this note—for this note of April the 3rd."

Though Mrs. Stewart's name was not typed in at the top of the 3 April note, it was MacQueen's impression that she was a maker on the instrument since he "saw Mrs. Stewart sign it on the blank where a maker signs the note."

Testimony by bank officials indicates that the MacQueen guaranty was intended to guarantee the note of 3 April. Roland Evans of First Union testified, "It was not intended or never discussed that these [the guaranty and the O'Grady letter of credit] would secure any other note. *They were to conform to that particular transaction*, to secure a $45,000.00 loan to the three men." (Emphasis added.) Evans further testified that "the collateral securities [including the guaranty] . . . were to secure payment on this note [of 3 April], which payment would be made after we had secured it." Bank officials further admitted that Mr. MacQueen was present at the 3 April signing, and that "he saw the note also after it had been signed." They gave him the guaranty form on 3 April, and though "he received no instructions to sign it in blank," it was admitted that "the purpose of this was to secure the loan that was being made—that was part of the transaction. Plaintiff's Exhibit 'A' [a schedule of collateral security, including the MacQueen guaranty, attached to the note of 3 April] was to be . . . a part of the transaction." Finally, bank officials admitted that, though they initially intended to have but the three men sign the note as makers, nonetheless, at the 3 April negotiations and signing, "we did request his wife [Mrs. Stewart] to sign the note. . . . She did sign it at our request. . . ."

From this evidence it appears that (1) both parties to the guaranty agreement intended that contract to secure the note of 3 April, and they intended it "to conform to that particular transaction"; (2) Mr. MacQueen intended that Mrs. Stewart be made a primary obligor on the guaranty agreement since he thought she had signed as a maker on the 3 April note; and (3) bank officials did not initially intend that Mrs. Stewart be a maker on the note,

but nonetheless had her sign the note with the other makers on 3 April in MacQueen's presence. Their intentions regarding her status at the time they had her sign the note are not clear.

Since both parties intended that the guaranty secure the note of 3 April, and conform to that transaction, it would follow that there was an understanding between the parties that the guaranty would secure payment by those persons who were principally liable on the note of 3 April. Since the MacQueens signed the guaranty form in blank and delivered it to bank officials to fill in the names of those whose debts the guaranty was to secure, from the principles of contract set out above, the bank had the duty to fill in as primary obligors those parties who were makers on the note of 3 April, as was generally agreed on by the parties. There is, as noted above, some discrepancy between the parties' subjective impressions as to just who the makers of the note were. Though testimony by First Union officials is not clear, we will assume that they did not think that Mrs. Stewart was primarily liable on the note, and for this reason omitted her name from the guaranty form. In that Mrs. Stewart's status on the note is a question of law rather than fact, it is clear that the validity of the guaranty agreement will hinge on the legal question as to whether she signed the note in the capacity of a maker. Since the parties were generally agreed that the guaranty form would secure the obligations of those principally liable on the 3 April note, the minds of the parties did meet upon a proposition sufficiently definite to be enforced against both parties. *Cf. Elks v. Insurance Co., supra.* A unilateral mistake by either MacQueen or First Union regarding the legal effect of Mrs. Stewart's signing the note would not excuse either party from his respective obligations.

The note of 3 April indicates that Flora Stewart affixed her signature and seal to the bottom righthand corner of the instrument, among the signatures of the makers of the note. Her name was not, however, typed in at the top as a "borrower-debtor." G.S. 25-3-402 says that unless an instrument clearly indicates that a signature is made in some other capacity, such signature will be deemed an endorsement. The Official Comment to that provision says that a signature in the righthand corner of an instrument indicates an intent to sign as a maker of a note. Though there have been suggestions to the contrary (*see* 2 Bender's Uniform Com-

mercial Code Service, Commercial Paper § 2.07[3]), we hold that, by signing the note at a place regularly provided for makers of a note, Mrs. Stewart thereby became a maker of the note rather than an endorser. Her signature at this place, plus the fact that the terms of the note itself refer to the "undersigned" as "debtor," dispels any ambiguity which might render her an endorser under G.S. 25-3-402. Other courts have held likewise. *See Bankers Trust of South Carolina v. Culbertson*, 268 S.C. 564, 235 S.E. 2d 130; *Kerr v. DeKalb County Bank*, 135 Ga. App. 154, 217 S.E. 2d 434. This holding accords with prior law in this State. *See Bank v. Jonas*, 212 N.C. 394, 193 S.E. 265 (1937). Having signed the note as maker, it is clear that, under G.S. 25-3-118(e), Mrs. Stewart was jointly and severally liable with the other makers of the note, and thus was a principal party to the agreement.

Since Mrs. Stewart was, as a matter of law, a maker on the note of 3 April, under the principles of contract law set forth above, the MacQueens have established a *prima facie* case for the invalidity of the guaranty agreement. By virtue of First Union's request that Mr. MacQueen fill out a guaranty form to secure the note of 3 April, and the parties' express agreement that the guaranty would conform to that note, the parties were agreed, and the MacQueens were led to believe, that the guaranty was to secure the obligation of those principally liable on the note. By requesting that Mrs. Stewart sign the note along with the other makers. First Union led Mr. MacQueen to believe that Mrs. Stewart was a maker on the note. That Mrs. Stewart was a maker on the note is clear from the face of the instrument. These matters being established, it is clear that First Union's own actions put them on notice as to the MacQueens' intentions regarding those whose obligations the guaranty was to secure. Having such notice, the bank had the duty to include Mrs. Stewart among the "primary obligors" of the guaranty form. The record indicates that they failed to do this, contrary to the parties' general agreement and the MacQueens' implicit authorization stemming from this agreement. Nothing else appearing, the guaranty agreement would be invalid, and the trial court's conclusions of law would not be supported by the evidence.

[2]     There is a factual dispute which prevents us from reaching a final determination of this issue, the resolution of which will require a factual determination on retrial. At trial Mr. MacQueen

testified that he submitted the incomplete guaranty form to Robert Helms of First Union, and that he did not know who filled in the names of the obligors. Mr. MacQueen further said that he has "never seen the guaranty filled out." Robert Helms testified that he inserted the obligors' names on the form, and that he did so in Mr. MacQueen's presence. If it is found that the names of the obligors were not supplied on the form in Mr. MacQueen's presence, then the MacQueens would not be bound by that agreement. If, however, the trial court finds that these three names were inserted in MacQueen's presence, and that MacQueen acknowledged the presence of but three obligors on the guaranty form, then Mr. MacQueen would be bound by the guaranty if certain other conditions are satisifed which will be discussed below. By acknowledging the presence of the three obligors on the guaranty, Mr. MacQueen would have implicitly agreed to and authorized the omission of Mrs. Stewart, a primary obligor on the note of 3 April.

If there is a finding that MacQueen acknowledged the omission of Mrs. Stewart's name from the guaranty form, the MacQueens' liability on that guaranty would be further conditioned by the questions whether Mr. Stewart is liable on the note of 9 April, and whether the MacQueen guaranty could be applied to the note of 9 April even if Mr. Stewart is not liable on that note.

[3] The plaintiffs contend that Mr. Stewart is not liable on the note of 9 April for reason that Jack Pridemore did not have the authority to sign that note. A reading of the power of attorney conferred on Pridemore by Mr. Stewart confirms their contention. This power was limited to transactions concerning property in Robeson County alone, and the uncontested evidence shows that the note of 9 April was signed to procure funds for properties in South Carolina and Rocky Mount, North Carolina, as well as in Robeson County.

Defendant First Union cannot avail itself of the argument that Mr. Stewart is liable by virtue of Pridemore's apparent authority. If the act of an agent is one which requires authority in writing (such as a power of attorney, under G.S. 47-115.1), those dealing with him are charged with notice of that fact and of any limitation or restriction on the agent contained in such written authority, for the principal is bound only to the extent of that

authority. *See Thompson v. Power Co.*, 154 N.C. 13, 69 S.E. 756 (1910). In such instances the doctrine of apparent authority does not apply, for a third party is deemed to have notice of the nature and extent of the agent's authority. *See Investment Properties v. Allen*, 283 N.C. 277, 196 S.E. 2d 262 (1973); *Commercial Solvents v. Johnson*, 235 N.C. 237, 69 S.E. 2d 716 (1952); *Texas Co. v. Stone*, 232 N.C. 489, 61 S.E. 2d 348 (1950). In present case defendant First Union had both actual and constructive notice of the scope of Pridemore's authority. Mr. Stewart is not, therefore, liable on the note of 9 April merely by virtue of Pridemore's unauthorized signature.

[4]   Defendants contend that, even if Stewart is not liable on the note by virtue of Pridemore's signature, and even though Mrs. Stewart's name was omitted from the guaranty, the MacQueen guaranty can still be applied to satisfy the note of 9 April. First Union argues that the guaranty covers not only the joint debts of the three men listed as primary obligors, but also applies to the individual debt of any one of those primary obligors. Therefore, even if Stewart were not liable, the MacQueen guaranty would apply to the debt of Pridemore and Huddleston under the note of 9 April. An assessment of this argument's validity requires that we examine the specific terms of the MacQueen guaranty.

The form of guaranty in present case lists under the heading "Primary Obligor(s)" the three names "Jack F. Stewart, James R. Pridemore, Wayne C. Huddleston." Under the heading "Guarantor(s)" are listed the names "Peter MacQueen III, Mary G. MacQueen." The form thereafter provides:

"WHEREAS, the above PRIMARY OBLIGOR(S) (hereinafter collectively termed 'Customer') desire(s) to obtain extensions of credit . . . and otherwise to deal with FIRST UNION NATIONAL BANK OF NORTH CAROLINA (hereinafter termed 'FUNB'); and

"WHEREAS, FUNB is unwilling to extend or continue to extend credit to . . . and otherwise to deal with Customer; unless it receives an unconditional and continuing, joint and several guaranty from the above identified, undersigned GUARANTOR(S) (hereinafter collectively termed 'Guarantor'), covering all 'Obligations of Customer,' as hereinafter defined."

The form then provides that the guarantor, jointly and severally "hereby absolutely and unconditionally guarantees to FUNB and its successors and assigns the due and punctual payment of all liabilities and obligations of said customer to FUNB . . . as and when the same become due and payable. . . ." The document then lists a plethora of comments and waivers concerning the nature and extent of this guaranty. There is, however, no specific provision within the agreement which specifically stipulates or clearly indicates that the guaranty extends to the individual debts of each person listed as an obligor. In fact, the instrument explicitly provides that the three men denominated "primary obligors" shall be "hereinafter collectively termed 'Customer'." Provisions thereafter refer to "all Obligations of Customer," and the guarantors agree to guarantee "all liabilities and obligations of said Customer." "Customer" is throughout the instrument referred to in the singular. Given the rule of construction that the terms of a written contract are to be construed most strongly against the party who drafted the instrument, *see Jones v. Realty Co.*, 226 N.C. 303, 37 S.E. 2d 906 (1946), 17 Am. Jur. 2d, Contracts § 276, and the similar rule that the liability of a guarantor is not to be enlarged beyond the strict terms of the contract, *see Shoe Co. v. Peacock*, 150 N.C. 545, 64 S.E. 437 (1909), we read the terms of the guaranty agreement such that it extends only to the joint and several debts of the three individuals listed as obligors. The guaranty would not, therefore, extend to cover the individual debts of one of the obligors or the joint and several debts of but two of the obligors.

Since Stewart is not liable on the note of 9 April by virtue of Pridemore's unauthorized signature, it would appear that, under principles of the law of contract, the MacQueen guaranty, by its terms, cannot be extended to guarantee that note. This proposition is consonant with the law of suretyship and guaranty. Simpson, in his treatise on Suretyship, *supra*, § 54, says of forged and unauthorized signatures: "[W]here one coprincipal forges the other principal's name, and a surety guarantees the supposed obligation of both principals, otherwise than by endorsing their negotiable note, such surety is not liable to the creditor." As was said in *Green v. Kindy*, 43 Mich. 279, 5 N.W. 297: ". . . Unlike an endorser upon a negotiable instrument, he [the surety or guarantor] does not warrant the previous signatures to be genuine, and

if it afterwards appears that his principals did not sign and were not bound, he cannot be held, as he entered into no such obligation. His responsibility cannot thus be enlarged, nor can a new contract obligation be created against him."

The reasons behind this rule are similar to those underlying the rule that the creditor's release of a principal debtor will discharge a surety (see *Lumber Co. v. Buchanan*, 192 N.C. 771, 136 S.E. 129 (1926); *Evans v. Raper*, 74 N.C. 639 (1876); *Draughan v. Bunting*, 31 N.C. 10 (1848)), and the doctrine that a material alteration of a contract between principal and creditor will discharge a surety (see *Fleming v. Barden*, 127 N.C. 214, 37 S.E. 219 (1900); *Hinton v. Greenleaf*, 113 N.C. 6, 18 S.E. 56 (1893); Simpson, *supra*, § 72; Lee, *supra*, § 42). The omittance or release of a principal destroys a surety's rights of subrogation against that principal. Furthermore, as this Court said in *Evans v. Raper, supra*, the surety or guarantor "has contracted to guarantee a specific agreement, and if a new agreement be substituted without his assent, his contract is at an end." 74 N.C. at 643. By the terms of their guaranty, the MacQueens agreed to guarantee the joint debts of Stewart, Pridemore and Huddleston. They did not guarantee the performance of a contract under which Huddleston and Pridemore only were liable. First Union cannot, therefore, apply the guaranty to the note of 9 April unless Stewart is in some manner liable thereon.

[5] Though Pridemore was not authorized to sign the note of 9 April for Mr. Stewart, there is evidence in the record which tends to show that Stewart took control of bank accounts containing certain of the proceeds from the note. G.S. 25-3-404(2) says, "Any unauthorized signature may be ratified for all purposes of this article. . . ." The Official Comment to this provision notes that a retention of benefits, with knowledge of his unauthorized signature, by one whose name was signed without authorization may be found to be a ratification. Other courts have so held. *See Thermo Contracting Corp. v. Bank of N.J.*, 69 N.J. 352, 354 A. 2d 291; *Citizens Valley Bank v. Mandrones Mining Co.*, 257 Or. 260, 478 P. 2d 409. This provision is consonant with prior law in this State. *See Bank v. Grove*, 202 N.C. 143, 162 S.E. 204 (1932); *Sugg v. Credit Corporation*, 196 N.C. 97, 144 S.E. 554 (1928). *See also Trust Co. v. Gill, State Treasurer*, 286 N.C. 342, 211 S.E. 2d 327 (1975). If Mr. Stewart took control of the proceeds of the loan

with knowledge of the source of those proceeds and with knowledge that James Pridemore had signed Stewart's name to the note of 9 April, Stewart must be held to have ratified Pridemore's unauthorized signature. Absent a finding of facts, we cannot reach a final determination of this issue. If facts are found to this effect, this would entail the joint and several liability of Stewart, Pridemore and Huddleston on the note of 9 April. Since the MacQueen guaranty applies to the collective debts of these three individuals, MacQueen would then be liable to the extent of $7,500 to First Union (unless it is found that the MacQueen guaranty is not binding, in accordance with the directions set forth above).

We next consider plaintiff O'Grady's appeal. Pursuant to the agreement of the parties to the note of 3 April, Thomas O'Grady, on or about 9 April 1975, had the Bank of North Carolina issue an instrument entitled "Commercial Letter of Credit." That instrument reads in part as follows:

"Issued in favor of First Union National Bank

*    *    *

We hereby establish an irrevocable Letter of Credit in your favor for the account of Thomas O'Grady for the aggregate amount of Twenty-six Thousand Dollars ($26,000.00) available by your draft at site on the Bank of North Carolina, accompanied documents specified below:

Certified and true photostatic copy of each instrument causing this establishment of credit to Thomas O'Grady to be called upon.

We hereby agree with the bona fide holders that all drafts, under their compliance with terms of this credit, shall be duly honored on presentation and delivery of the documents specified to the drawee and drawn and presented for negotiations on or before April 9, 1976.

BANK OF NORTH CAROLINA, N.A.
by: s/ W. K. WHITMIRE
Vice President"

[6]   The record indicates that Thomas O'Grady was not present at the initial negotiations and signing of the note of 3 April. Mr. O'Grady testified that he had no communication with First Union officials and that he had told no one in First Union that a condition of his issuing the letter of credit would be the liability of Mr. and Mrs. Stewart on the principal debt. James Pridemore, however, testified that at the 3 April meeting with bank officials:

> ". . . Mrs. Stewart executed the note on that day. The question came up and Mr. O'Grady had made this a condition. . . . The question was raised as to whether Mrs. Stewart was signing it, and he [Mr. Stewart] quickly said she would be happy to sign it, and she did, and I stated this was a condition of Mr. O'Grady's. . . ."

Bank officials testified that no mention of any condition was made in connection with the O'Grady letter of credit serving as collateral security on the note of 3 April. Mr. Evans of First Union did, however, testify, "We did request his wife [Mrs. Stewart] to sign the note. . . ." From the record it is clear that this letter of credit was listed as collateral on the schedule attached to the note of 3 April. This note was cancelled on 9 April, and the letter of credit was once again listed as collateral on the schedule attached to the note of 9 April, the note from which Mrs. Stewart's signature was omitted.

Due to the trial court's failure to find facts, we cannot determine whether a condition regarding the applicability of the letter of credit was communicated to First Union. There is conflicting evidence on this point. Bank officials testified that no such condition was communicated by anyone. Pridemore's testimony would tend to indicate that a condition was communicated by him, as O'Grady's agent, though it is not clear from the record whether this condition was communicated to bank officials or to Stewart alone. The question for our determination is, assuming that Pridemore did direct his comment on O'Grady's condition to bank officials, whether this fact would justify the sustaining of the injunction against Bank of North Carolina and cancellation of the letter of credit.

[7]   The type of letter of credit before us has been termed a "guaranty" letter of credit. *See* Verkuil, "Bank Solvency and Guaranty Letters of Credit," 25 Stan. L. Rev. 716 (1973). *See also*

Note, "Guaranty Letters of Credit: Problems and Possibilities," 16 Ariz. L. Rev. 822 (1974). The term is used to describe a transaction in which a letter of credit is used to accomplish the ends of a contract of guaranty or suretyship. In such transactions the letter functions to secure performance of an obligation. This differs from a more traditional use of a letter of credit in transactions for the sale of goods, where the issuing bank makes itself primarily liable to the seller of goods, paying the seller on his presentation of a draft accompanied by various sorts of shipping documents. *Cf.* Verkuil, *supra*, p. 718 ff. Article 5 of the Uniform Commercial Code makes no distinction between these different uses of the letter of credit. Its provisions are intended to apply regardless of the nature of the transaction underlying the letter.

[8]   G.S. 25-5-103(1)(a) defines a "letter of credit" as "an engagement by a bank or other person made at the request of a customer . . . that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit. . . ." ("Customer" is defined as "a buyer or other person who causes an issuer to issue a credit," and "issuer" is defined as "a bank or other person issuing a credit." *See* G.S. 25-5-103(1)(g) and (c)). To be a letter of credit an instrument must satisfy the requirements of G.S. 25-5-103(1)(a), and, in addition, must be in writing and signed by the issuer. G.S. 25-5-104(1). If a letter is issued by a bank and does not require a documentary draft or documentary demand for payment or, although requiring neither of these, is issued by a person other than a bank and does not require that the draft or demand be accompanied by a document of title, then the letter must "conspicuously state that it is a letter of credit." G.S. 25-5-102(1)(c). *See* White and Summers, Uniform Commercial Code, sec. 18-4 (1972). These are the sole formal requirements for the formation of a valid letter of credit. No consideration between customer and issuer is necessary. *See* G.S. 25-5-105. The document issued by the Bank of North Carolina satisfies these formal requirements.

The sole condition of honor specified in the letter of credit before us is that First Union submit certified and true copies "of each instrument causing this establishment of credit to Thomas O'Grady to be called upon." This condition seems to require a "documentary draft," or "documentary demand for payment," defined in G.S. 25-5-103(1)(b) as "one honor of which is conditioned

upon the presentation of a document or documents." "Document" is broadly defined under this section as "any paper including document of title, security, invoice, certificate, notice of default and the like." The sole condition of honor specified in the O'Grady letter is, presumably, accompanying any draft with the note listing the O'Grady letter as collateral and notice of default by those primarily liable on that note.

[9]   Since the letter of credit is essentially a contract between the issuer and the beneficiary, it is recognized by Article 5 as being independent of the underlying contract between the customer and the beneficiary. *See* Official Comment to G.S. 25-5-114; *Venizelos, S.A. v. Chase Manhatten Bank*, 294 F. Supp. 246, 248 (S.D.N.Y. 1968), *rev'd on other grounds*, 425 F. 2d 461. G.S. 25-5-114(1) imposes on the issuer a duty to honor drafts where there has been compliance with the terms of the credit. *Courtaulds N. America, Inc. v. North Carolina National Bank*, 387 F. Supp. 92 (M.D.N.C. 1975), *rev'd on other grounds*, 528 F. 2d 802. That statute says: "An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer and the beneficiary. . . ." *See also Intraworld Industries, Inc. v. Girard Trust Bank*, 461 Pa. 343, 336 A. 2d 316; *O'Meara Co. v. National Park Bank*, 239 N.Y. 386, 146 N.E. 636.

The only exceptions to the issuer's duty to honor documents which on their face comply with the terms of the credit are those listed under G.S. 25-5-114(2). These exceptions are: (1) the failure of certain documents to conform to certain specified warranties, (2) the presentment of forged or "fraudulent" documents, and (3) "fraud in the transaction." G.S. 25-5-114(2)(a) holds that even these exceptions do not excuse the issuer from honor of a draft presented by one who is in the position of a holder in due course. A reason given for the issuer's stringent duty to honor in spite of alleged infirmities in the underlying contract is that one of the basic purposes of the letter of credit is to eliminate the risk to the beneficiary that the customer will refuse or halt payment because of alleged deficiencies in the beneficiary's performance. *See* White and Summers, *supra*, sec. 18-6, p. 616.

[10]   The power of a court of appropriate jurisdiction to enjoin honor of a draft when one of the G.S. 25-5-114(2) exceptions is

shown is expressly recognized in section (2)(b) of that provision. Given the independence of the issuer's obligation to the beneficiary, and the commercial purposes which this independent obligation serves, it would appear that an injunction should issue to enjoin payment of a draft only in those instances where there is some action by the beneficiary which vitiates the transaction between the beneficiary and the issuer. *Cf. Intraworld Industries, Inc. v. Girard Trust Bank, supra.* Since the transaction between the beneficiary and the issuer is one consisting of an exchange of documents, only some defect in these documents would justify an injunction against honor. G.S. 25-5-114(2) speaks to those defects in documents which are not apparent on the face of the documents, and permits dishonor or the issue of an injunction only in situations where the documents presented are themselves the product of some sort of fraud. Accordingly, the beneficiary's fraud on the customer in the inducement of their separate contract would not justify dishonor or an injunction, nor would a breach of warranty or defect in the quality of the goods delivered pursuant to the underlying contract, for these defects are not of the sort which relate to the contract between the issuer and beneficiary. *Cf. Werner v. A.L. Grootemaat & Sons, Inc.*, 80 Wis. 2d 513, 259 N.W. 2d 310; *Bossier Bank & Trust Co. v. Union Planters Nat. Bank*, 550 F. 2d 1077 (6th Cir. 1977). White and Summers, *supra*, sec. 18-6, pp. 625-26.

[11] That the exceptions to honor stated in G.S. 25-5-114(2) concern merely the genuineness of the documents presented for honor is evident from its terms, and from various courts' interpretations of "fraud in the transaction." The phrase "fraud in the transaction" is a codification of the law of a New York case, *Sztejn v. Schroder Banking Corp.*, 177 Misc. 719, 31 N.Y.S. 2d 631. In that case the court granted an injunction against honor of a letter of credit where the seller-beneficiary had shipped fifty cases of rubbish instead of the fifty cases of goods ordered. The fraud referred to in that case was that involved in presenting to the issuer documents, for purposes of honor, which totally misrepresented the nature of the goods actually shipped. The court said that letter of credit doctrine "presupposes that the documents accompanying the draft are genuine," and held that where the beneficiary intentionally ships no goods at all, the documentation is not genuine. Thus, "fraud in the transaction"

under G.S. 25-5-114(2) would refer to the beneficiary's accompanying his draft with documents or declarations which have absolutely no basis in the facts of the underlying performance. *Cf. Dynamics Corp. of Amer. v. Citizens & Southern Nat. Bank,* 356 F. Supp. 991, 999 (N.D.Ga. 1973); *Intraworld Industries, Inc. v. Girard Trust Bank, supra.* Since the documents in present case, the note and notice of default, do reflect the nature of the underlying performance and default, there are no grounds here for a claim of fraud in the transaction.

[12]   The Official Comment to G.S. 25-5-114 gives little indication of the meaning of the term "fraudulent" document. Presumably such a document would be one that is completely forged or drawn up without any underlying basis in fact, one that is but partly spurious or a document which has been materially altered. *See* White and Summers, *supra,* sec. 18-6, p. 625; Miller, "Problems and Patterns of the Letter of Credit," 1959 U. Ill. L.F. 162, 185-87. *Cf. Dynamics Corp. of Amer. v. Citizens & Southern Nat. Bank, supra; Marine Midland Grace Trust Co. of N.Y. v. Banco Del Pais, S.A.,* 261 F. Supp. 884 (S.D.N.Y. 1966); *Old Colony Trust Co. v. Lawyers' Title & Trust Co.,* 297 F. 152 (2d Cir. 1924); *Nacional Financiera, S.A. v. Banco De Ponce,* 275 App. Div. 827, 89 N.Y.S. 2d 480; *Brown v. C. Rosenstein Co.,* 120 Misc. 787, 200 N.Y.S. 491.

[13]   Based on these cases and our interpretation of G.S. 25-5-114(2), we believe that the knowing and intentional attachment of a guaranty letter of credit, as collateral security, to a negotiable instrument which that letter was not intended to secure, and the eventual presentation of these documents to the issuing bank for purposes of honor of the letter of credit, would amount to a presentment of fraudulent documents under G.S. 25-5-114(2). In such a case, though the note may be valid as against other parties to the note, the documents, considered as a whole, are nonetheless fraudulent insofar as the letter of credit was not intended to secure that particular note, and the beneficiary had knowledge of this fact.

[14]   In the case before us, if the trial court finds, on retrial, that Pridemore did give notice of O'Grady's condition in the presence of bank officials, that such notice was directed to bank officials, and that bank officials had knowledge of this condition, then the presentment of the 9 April note and notice of default to Bank of

North Carolina for purposes of drafting on the letter of credit would be a presentment of fraudulent documents, and plaintiff O'Grady would be entitled to a permanent injunction and cancellation of the letter of credit. If such is found to be the case, the documents would be fraudulent in that the portion of the 9 April note listing the letter of credit as collateral would have no basis in the facts of the agreement between the parties. In that case, the documents would not be those which gave rise to the establishment of credit referred to in the letter itself. On the other hand, if the court finds that Pridemore gave notice of the condition in the presence of bank officials, but that such notice was directed only to Stewart and was not acknowledged by bank officials in some manner, the preliminary injunction against Bank of North Carolina must be dissolved.

[15]  We finally consider plaintiff James Pridemore's appeal. Pridemore alleges that he signed the note of 3 April on condition that Jack F. Stewart, Flora Stewart and Wayne Huddleston, the comakers, were bound on that note. He argues that on 9 April First Union released Mr. and Mrs. Stewart and Mr. Huddleston from said debt by cancelling the 3 April note. In exchange for cancellation of the 3 April note First Union took a new note which, Pridemore alleges, was not properly executed by the other three parties. Pridemore says that his signing of the 9 April note was likewise conditioned on the Stewarts' liability on that note, and since the Stewarts are not liable, the note cannot be binding on him either.

In all of this plaintiff fails to note that he alone signed the note of 9 April, both for himself and in his capacity as agent for Messrs. Stewart and Huddleston. His allegation that he is not bound on this note because Mrs. Stewart was not made a party cannot be sustained for the obvious reason that he, signing the note in the presence of bank officials with full knowledge that she was not listed as a principal on the note, did not insist that she be made a party to the note.

Likewise, Pridemore cannot secure release from liability by virtue of the fact that Mr. Stewart's signature on the note is not binding on Stewart, for Pridemore himself affixed Stewart's signature to the note under the impression that he had authority to do so. Though the bank had a duty to ascertain the scope of

Pridemore's authority, Pridemore, being the agent, clearly had this duty as well. And though Pridemore is not liable to the bank by virtue of his unauthorized signature under G.S. 25-3-404(1) since the bank took the note with notice that the signature was unauthorized, *cf. Vass v. Riddick*, 89 N.C. 6 (1883), Pridemore is, nonetheless, liable on his signature of his own name on the note. Since both parties are deemed to have had knowledge of the scope of Pridemore's authority, it is as though they had agreed that Pridemore and Huddleston alone would be the makers of the note. A finding of Stewart's ratification of Pridemore's signature, in accordance with the directions set forth above, would further render Pridemore liable by virtue of this ratification. Pridemore's assignments of error are therefore overruled.

For the reasons stated above, the decision of the Court of Appeals is reversed as to plaintiffs MacQueen and O'Grady, and the cause is remanded to the Court of Appeals with direction that it be remanded to the Superior Court of New Hanover County for trial *de novo*, in accordance with this opinion, as to those plaintiffs, before a jury, unless the parties again waive the right to a jury trial which they reserved initially. *See Helms v. Rea*, 282 N.C. 610, 194 S.E. 2d 1 (1973).

The decision of the Court of Appeals as to plaintiff Pridemore is affirmed.

Reversed and remanded as to plaintiffs MacQueen and O'Grady.

Affirmed as to plaintiff Pridemore.

Justice BRITT took no part in the consideration or decision of this case.