450 So.2d 1 (1984)
Terry A. CROMWELL, M.D., Plaintiff-Appellee,
v.
COMMERCE & ENERGY BANK OF LAFAYETTE and Fidelity National Bank of Baton Rouge, Defendants-Appellants.
No. 83-461.
Court of Appeal of Louisiana, Third Circuit.
April 11, 1984.
On Rehearing May 9, 1984.
*2 Ernest L. Parker, Bean & Parker, Hayes & Durio, Stephen G. Durio, Mark C. Andrus, Broadhurst, Brook, Mangham, Hardy & Reed, Oscar Reed, Mouton, Roy, Carmouche, Bivins, Judice & Henke, H. Purvis Carmouche, Laborde & Lafargue, Cliffe Laborde, (Logan & Assoc., William Logan, Onebane, Donohae, Bernard, Torian, Diaz, McNamara & Abell, Dennis Doise, Gary J. Russo, Henry C. Perret, Lafayette of counsel), Guillory, McGee & Mayeux, Aaron F. McGee, J. Winston Ardoin, Ardoin & Daigle, Eunice, Kantrow, Spaht, Weaver & Walter, Lee C. Kantrow, Downing, Cazedessue & Powers, John D. Powers, Baton Rouge, Gist, Methvin, Hughes & Munsterman, John W. Munsterman, Alexandria, Henry H. Lemoine, Jr., Pineville, Bauer, Darnell & Boudreaux, Mary Coon Biggs, Franklin, Darrell D. Ryland, Marksville, for plaintiff-appellee.
Steen, Rubin, Curry, Calvin & Joseph, Michael H. Rubin, John Dale Powers, Baton Rouge, Charles Kohlmeyer, Jr., William R. Forrester, Jr., Peter L. Koerber, Kohlmeyer & Matthews, Lemle, Keleher, New Orleans, for defendants-appellants.
J. Michael Cutshaw, Baton Rouge, amicus curiae.
Robert G. Jackson, Baton Rouge, for intervenors-appellants.
Susan H. Rouprich, Baton Rouge, for defendant-appellee.
Before CUTRER, YELVERTON and KNOLL, JJ.
CUTRER, Judge.
This is an appeal from a trial court judgment which granted plaintiff's request for a preliminary injunction to prevent payment of drafts under letters of credit.
This case and the four cases mentioned below involve essentially the same substantive questions. In each case the plaintiff or plaintiffs are limited partners of the same Louisiana limited partnership; the party who is being denied payment is the same; and, the party whose conduct we are asked to scrutinize in each, the general partner of the Louisiana limited partnership, is the same. While the defendants, the banks under injunction in these cases vary, they all stand, vis a vis the parties mentioned above, in near identical positions. Therefore, for ease of reading, this opinion will refer to plaintiffs and the defendants collectively with the intent that this opinion serve as a basis for decision in each case. Consolidated with this case are (1) Breaux, et al. v. First National Bank of Lafayette, 450 So.2d 13 (La.App. 3rd Cir.1984); (2) Anderson, et al. v. American Bank & Trust Company of Lafayette, et al., 450 So.2d 14 (La.App. 3rd Cir.1984); (3) Bauer, et al. v. First National Bank of Lafayette, et al., 450 So.2d 15 (La.App. 3rd Cir.1983); and (4) Long v. Security First National Bank, 450 So.2d 16 (La. *3 App. 3rd Cir.1983). A separate decision will be rendered in each case.

FACTS
In 1981, Combined Equities, Inc. (C.E., Inc.) and its affiliated services companies of Baton Rouge, Louisiana, had been in operation for approximately five years. These companies were engaged in the syndication and management of limited partnerships. C.E., Inc.'s primary sources of revenue were fees derived from the organizational, syndication, management, financial advisory and other services rendered to limited partnerships which it had formed. During the year 1981, the officers of C.E., Inc. decided to syndicate a limited partnership to be known as Combined Investments, Ltd. (C.I., Ltd.).
Pursuant to this decision, the personnel of C.E., Inc. prepared the usual document known as the Private Placement Memorandum (PPM). This instrument, along with the closure instruments and the articles of partnership, set forth the details and established the whole of the relationship between the general partner (C.E., Inc.) and the limited partnership to be formed (C.I., Ltd.). The PPM was dated June 1, 1981.
C.E., Inc., through its sales staff, began the syndication sales of "units" in C.I., Ltd.[1] C.E., Inc. proposed to sell as many as 100 units in C.I., Ltd., each valued at $250,000.00. (Though each unit had a value of $250,000.00, each investor/limited partner was required to put up only $20,000.00 in cash; the remainder of the price of the unit was covered by a $30,000.00 note and a $200,000.00 note secured by a $200,000.00 letter of credit from one of the defendant banks. The tax benefits which flowed from such an arrangement will be discussed below.) The sales did not proceed as expected and the number of units originally sold was 39.
The prospective investors were each provided a copy of the PPM upon the initial contact by the sales personnel. Investors were cautioned, by the PPM, that an investment in C.I., Ltd. represented a long-term investment which would involve significant risk factors and should be considered only by persons who had substantial net worth and a substantial anticipated income.
The proposed limited partnership (C.I., Ltd.) was formed according to the law of Louisiana, LSA-C.C. art. 2836 et seq. Pertinent articles in this regard are as follows:
LSA-C.C. article 2837:
"A partnership in commendam consists of one or more general partners who have the powers, rights, and obligations of partners, and one or more partners in commendam, or limited partners, whose powers, rights, and obligations are defined in this Chapter."
LSA-C.C. article 2840:
"A partner in commendam must agree to make a contribution to the partnership. The contribution may consist of money, things, or the performance of nonmanagerial services. The partnership agreement must describe the contribution and state either its agreed value or a method of determining it. The contract should also state the time or circumstances upon which the money or other things are to be delivered, or the services are to be performed, and if it fails to do so, payment is due on demand."
"A partner in commendam is liable for the obligations of the partnership only to the extent of the agreed contribution. If he does not make the contribution, or contributes only part of it, he is obligated to contribute money, or other things equal to the portion of the stated value that he has failed to satisfy. The court may award specific performance if appropriate."
LSA-C.C. article 2843:

"A partner in commendam does not have the authority of a general partner *4 to bind the partnership, to participate in the management or administration of the partnership, or to conduct any business with third parties on behalf of the partnership."

We particularly note the provision of art. 2843 which mandates that, to retain the status of a partner in commendam, a limited partner cannot have the authority to bind the partnership, nor can such limited partners participate in the management or administration of the partnership. The conducting of any business, management or administration of the affairs of a limited partnership must be relegated to the general partner. As we shall discuss later in this opinion, the PPM fully complies with the mandates of these provisions.
Looking at investments in limited partnerships from the standpoint of the investors, the primary purpose is to obtain income tax savings. The Federal Tax Law allows business partnerships to pass through to limited partners certain losses, beneficial for tax purposes, according to the amount of "at risk" money invested. This includes the cash, notes and letters of credit invested for each unit. The total amount of money "at risk" by the investor in each unit in this appeal is $250,000.00; thus, the limited partner can get a tax benefit based upon a $250,000.00 investment when he has only $20,000.00 cash invested. Investments by the limited partnership are highly leveraged; i.e., the notes and letters of credit of the limited partners are used to secure loans, the proceeds of which are used for the operation and investments of the partnership.
A distinguishing characteristic of this PPM is that it set up a "blind pool" arrangement. This means that the limited partnership, at the time the units were sold, stated it owned no property, had not identified any property it intended to purchase and was not engaged in negotiations to purchase any property. In essence, the cash invested by the plaintiffs and the proceeds of any loans secured by the plaintiffs' notes and/or letters of credit went into a "pool," the uses of which the investors were "blind" to determine. This "blind pool" arrangement, when considered along with the plenary authority given to the general partner in the PPM and the partnership agreement, carries the non-activity of the limited partners to a near-maximum extreme.
To become an investor in C.I., Ltd., the plaintiff/investors had to execute several "closing documents." The first instrument was entitled "Pre-offering Suitability Letter." In this document the investor, among other things, recognized that he had been afforded an opportunity to employ an offeree representative to examine the PPM and advise him as to the merits and risks of the investment in the partnership. If the investors did not employ an offeree representative then he warranted that, by reason of his knowledge and experience in financial and business matters in general, and investments in particular, he was able to evaluate the merits and risks of the investment in this partnership.
We wish to particularly point out that each of the plaintiff/investors agreed to be bound by "all the terms and conditions set forth in the PPM dated June 1, 1981."
In addition to a broad power of attorney executed by the plaintiffs in favor of the general partner (C.E., Inc.) personnel, the PPM contained the following provision as to the exclusive management of the limited partnership by the general partner, C.E., Inc.

"All decisions with respect to the management of the Partnership will be made exclusively by the General Partner under the Partnership Agreement and Limited Partners have no right or power to take part in management of the Partnership. Subject only to certain limitations described above, the General Partner has complete discretion in making investments of Partnership funds...."
(PPM 46, 47.)
We point out these provisions to show that the plaintiff/investors completely divested themselves of any authority in the management or decision-making process of the partnership. This divesture of authority is *5 in compliance with the Louisiana law pertaining to partnerships in commendam, as previously discussed.
After approximately 39 units had been sold, the articles of partnership were executed on September 23, 1981. Immediately thereafter, C.E., Inc., as general partner, negotiated to have two loans made to C.I., Ltd. The Mercantile National Bank of Dallas, Texas, loaned C.I., Ltd. $5,400,000.00. Also, the First National Bank of Lafayette, Louisiana, loaned C.I., Ltd. $2,420,000.00. As security for the loans C.I., Ltd. pledged and assigned to the banks letters of credit along with a security interest in the limited partners' demand notes. These loans were consummated in late September 1981.
Using the funds generated by the loans and the cash contributions made by the limited partners, the general partner (C.E., Inc.), on behalf of C.I., Ltd., made investments. C.I., Ltd. acquired interests in partnerships which had been previously sponsored by the general partner or its affiliates. These interests were acquired by C.I., Ltd. making cash contributions and loans to C.E., Inc.'s affiliated partnership which owned investment properties such as hotels, motels and condominiums, etc. The investments were consummated before December 31, 1981, and produced deductible tax losses for C.I., Ltd. in an amount equal to $73,957.00 per unit in the tax year 1981. These losses were passed directly to the owners of the C.I., Ltd. units and reported to the Internal Revenue Service by them on their various personal tax returns. Each of the limited partners was given a full report of the investments in a document dated March 10, 1982, entitled PPM Supplement.
In September 1981, the general partner (C.E., Inc.), had begun negotiations with the European American Bank and Trust Company of New York (E.A.B.) for a line of credit up to $10,000,000.00. After a thorough check on the financial stability and prior activities of the general partner and its officers, and negotiations as to the terms of the loan agreement, a line of credit to C.I., Ltd., in the amount of $10,000,000.00, was approved by E.A.B. The loan agreement was executed March 15, 1982. This loan was to "take out" or consolidate the loans made by the Dallas and Lafayette banks and to obtain a lower rate of interest on C.I., Ltd.'s outstanding debt.
To secure the E.A.B. loan the limited partners were requested to cancel their original letters of credit and to have new letters of credit issued by their Louisiana banks naming E.A.B. beneficiary. Each limited partner, pursuant to the request, authorized the cancellation of the original letter of credit, in favor of C.I., Ltd., and had a new letter of credit issued to E.A.B. The loans by the Dallas and Lafayette banks were paid from the proceeds of the E.A.B. loan. C.I., Ltd. defaulted on its loan from E.A.B. In November 1982, E.A.B. presented drafts to the various Louisiana issuing banks to collect on its security, the various letters of credit.
Plaintiffs, the limited partners of C.I., Ltd., filed suit against the banks which had issued the letters of credit, seeking to enjoin payment under the letters of credit to E.A.B.; E.A.B. intervened. The trial court granted temporary restraining orders preventing the defendant banks from honoring E.A.B.'s requests for payment of drafts presented under the letters of credit. After a hearing, the trial court found that there was fraud in the transaction between the general partner and the investors and, under the provisions of LSA-R.S. 10:5-114, issued a preliminary injunction enjoining the defendant banks from honoring E.A. B.'s drafts for payment of the letters of credit. From the trial court judgment E.A.B. appeals. Also, defendants, American Bank and Trust Company, Baton Rouge, Louisiana, and American Bank and Trust Company, Lafayette, Louisiana, appeal.[2]
We reverse and remand.

*6 ISSUE
The issue in this appeal is whether the trial court erred in its application of LSA-R.S. 10:5-114, thereby enjoining the issuing banks from honoring E.A.B.'s drafts on letters of credit held as security for its loan to C.I., Ltd.
LSA-R.S. 10:5-114 is a part of the Commercial laws adopted by the Legislature of Louisiana in 1974, made effective January 1, 1975. The Commercial laws (LSA-R.S. 10:1-101 et seq.) are modeled after the Uniform Commercial Code which has been adopted in every other state of this country.
We are particularly concerned with the underlined portion of LSA-R.S. 10:5-114 which reads as follows:

"(1) An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract between the customer and the beneficiary. The issuer is not excused from honor of such a draft or demand by reason of an additional general term that all documents must be satisfactory to the issuer, but an issuer may require that specified documents must be satisfactory to it.

(2) Unless otherwise agreed when documents appear on their face to comply with the terms of a credit but a required document does not in fact conform to the warranties made on negotiation or transfer of a document of title or of security or is forged or fraudulent or there is fraud in the transaction

(a) the issuer must honor the draft or demand for payment if honor is demanded by a negotiating bank or other holder of the draft or demand which has taken the draft or demand under the credit and under circumstances which would make it a holder in due course and in an appropriate case would make it a person to whom a document of title had been duly negotiated or a bona fide purchaser of a security; and
(b) in all other cases as against its customer, an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the document but a court of appropriate jurisdiction may enjoin such honor.

(3) Unless otherwise agreed an issuer which had duly honored a draft or demand for payment is entitled to immediate reimbursement of any payment made under the credit and to be put in effectively available funds not later than the day before maturity of any acceptance made under the credit." (Emphasis added.)
We have thoroughly examined the voluminous record accumulated at the trial court. (The record on appeal contains over 7,000 pages in some 36 volumes; various counsel have filed extensive briefs.) Due to the conclusions we have reached in this case, it is not necessary that we make a factual determination of whether the trial court was correct in finding that fraud had been committed in the underlying transaction. We have concluded that, assuming arguendo, such fraud did exist, the presence of such a fraud, in these cases, cannot serve as a basis for injunctive relief under the provisions of LSA-R.S. 10:5-114.

USES OF LETTERS OF CREDIT
The letter of credit is an extremely useful and necessary instrument for the facilitation of complex international and domestic business transactions. Before beginning a discussion of the issue we feel it is important to give some background on the many uses of letters of credit:

*7 "More small manufacturers and businesses are engaging in international trade, necessitating their use of letters of credit. Letters of credit are also becoming more common in domestic trade. * * * Most important, however, is the dramatic development of `standby' letters of credit, used in both domestic and international transactions to guarantee performance of such disparate contractual promises as construction of roads, sewers, or buildings, * * * payment of commercial paper, and maintenance of sophisticated communication, manufacturing, or other facilities in foreign countries. * * * The spread of letters of credit into nonsale areas, moreover, has just begun. The only limits on their use are the creative abilities of those who use them. * * * In short, letters of credit are being used in more ways, in more business transactions than ever before....."
(Footnote references omitted.)
Symons, Letters of Credit: Fraud, Good Faith and the Basis for Injunctive Relief, 54 Tul.L.Rev. 338 (1980).

TYPES OF LETTERS OF CREDIT: CONVENTIONAL AND STANDBY
As the letters of credit initially developed, its primary use was to facilitate sales-of-goods transactions. Such transactions involve basically three parties: (1) the buyer (customer) who requests that a letter of credit be issued; (2) a bank (issuer) which, at the customer's request, issues the letter of credit; and (3) the supplier (seller/beneficiary) to whom the letter of credit is issued and who is the person entitled to draft or demand payment on the letter of credit upon the presentment of the required documents to the issuing bank.
In this typical, or conventional, letter of credit transaction, three contractual relationships exist: (A) the underlying buy-sell agreement between the customer and the seller/beneficiary; (B) the contract between the issuer and the customer where the issuing bank agrees to issue the letter of credit to the seller/beneficiary and the customer (buyer) agrees to reimburse the bank for the sum paid plus the bank's charges; and (C) the letter of credit contract between the issuing bank and the seller/beneficiary in which the bank promises to honor the seller/beneficiary's draft, provided it is accompanied by documentation as may be required by the letter of credit.
In relatively recent years the "standby" letter has come into use. In the case at hand we are dealing with standby letters of credit.
The important difference between the usual "standby" letter of credit and the "conventional" letter of credit is that another party is added to the cast of participants. In the conventional letter of credit, there are three parties as described above. In that situation the seller and the beneficiary are one and the same person. In a standby situation (as in this case) we have the usual three parties (buyer, seller and issuing bank) plus an additional party, the lending bank. The lending bank accepts the customer's letter of credit as collateral and loans money to the seller to finance the underlying transaction between seller and customer. The lending bank is now the beneficiary; the dual role of the seller/beneficiary, as found in the conventional letter of credit, is split and the identity of seller, on the one hand, and beneficiary, on the other, rests in two separate and distinct entities. This difference is important as we shall discuss later in this opinion.

RULE OF "INDEPENDENT CONTRACTS" WITHIN LETTER OF CREDIT TRANSACTIONS
As the law of letters of credit developed, the courts recognized early that the letter of credit contract between the issuing bank and the seller/beneficiary must be viewed as separate and independent from the underlying business transaction between the customer (buyer) and the seller/beneficiary. This recognition by the courts led to the well-established rule of independent contracts in letter of credit *8 transactions. This rule means the issuing bank is under a legal duty to honor any demand for payment by the seller/beneficiary who complies with the terms of the letter of credit, without reference to the performance of the underlying contract.
The early recognition of the independent contract rule is exemplified in the case of Maurice O'Meara Co. v. National Park Bank, 239 N.Y. 386, 146 N.E. 636 (1925). This case involved the shipment of newsprint paper that was to be of a specified tensile strength. Upon shipment, the documents required by the letter of credit issued by the National Park Bank were presented to the bank with a demand for payment. Even though the documents presented complied with the letter of credit, the bank refused to honor the demand for payment on the ground that there had "arisen a reasonable doubt regarding the quality of the newsprint paper." The seller/beneficiary, O'Meara, sued the bank for payment of the letter of credit.
The Court of Appeal of New York affirmed a judgment on the pleadings for the seller/beneficiary, holding:

"This contract [between the issuing bank and the seller/beneficiary] was in no way involved in or connected with, other than the presentation of the documents, the contract for the purchase and sale of the paper mentioned. That was a contract between buyer and seller, which in no way concerned the bank. The bank's obligation was to pay sight drafts when presented if accompanied by genuine documents specified in the letter of credit. If the paper when delivered did not correspond to what had been purchased, either in weight, kind or quality, then the purchaser had his remedy against the seller for damages. Whether the paper was what the purchaser contracted to purchase did not concern the bank and in no way affected its liability. It was under no obligation to ascertain, either by a personal examination or otherwise, whether the paper conformed to the contract between the buyer and seller. The bank was concerned only in the drafts and the documents accompanying them. This was the extent of its interest. If the drafts, when presented, were accompanied by the proper documents, then it was absolutely bound to make the payment under the letter of credit, irrespective of whether it knew, or had reason to believe, that the paper was not of the tensile strength contracted for. This view, I think, is the one generally entertained with reference to a bank's liability under an irrevocable letter of credit of the character of the one here under consideration...."
* * * * * *

"To hold otherwise is to read into the letter of credit something which is not there, and this the court ought not to do, since it would impose upon a bank a duty which in many cases would defeat the primary purpose of such letters of credit...."
This independent contract rule is found in Louisiana law at 10:5-114(1), which reads as follows:
"(1) An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract between the customer and the beneficiary. The issuer is not excused from honor of such a draft or demand by reason of an additional general term that all documents must be satisfactory to the issuer, but an issuer may require that specified documents must be satisfactory to it."
This rule applies to conventional as well as standby letters of credit.

"FRAUD IN THE TRANSACTION"
The issue presented in this case revolves around the application of the words "fraud in the transaction" as found in R.S. 10:5-114(2) and the effect thereof on the drafts and demands of E.A.B. for payment on the letters of credit issued by the defendant banks.
*9 E.A.B. and the other appellants contend that LSA-R.S. 10:5-114(2) does not authorize injunctive relief to enjoin the payments by the defendant banks. E.A.B. contends that the term "fraud in the transaction" extends only to the loan transaction as that is the only transaction to which the lending bank, E.A.B. (beneficiary), was a party. E.A.B. contends that the independent contract rule applies and that the defendant banks cannot be enjoined from payment of the drafts submitted by E.A.B. since the documents presented to the defendant banks complied with the requirements of the letters of credit.
On the other hand, plaintiffs contend that the phrase "fraud in the transaction" refers to the underlying transaction between the plaintiffs and the general partner of C.I., Ltd. Plaintiffs contend that, if a fraud has been practiced in the underlying transaction, "that would ultimately cause a loss to the customer [plaintiffs] who would ultimately be obliged to reimburse the issuing bank, an injunction will lie against honor regardless of who perpetrated the fraud."
The trial court apparently agreed with the plaintiffs' position. The trial court found that C.I., Ltd., through the managing general partner, had perpetrated a fraud upon the plaintiffs, the limited partners of C.I., Ltd. The court based its legal finding of fraud primarily on its factual finding that C.I., Ltd., through C.E., Inc., had made investments beyond the express guidelines of the PPM. Also, the trial court felt that, since the PPM obligated C.E., Inc. to be responsible for capital contributions and negative cash flow up to $5,000,000.00, C.E., Inc. committed fraud by failing to reveal certain cash flow problems to the plaintiffs. (For the purpose of this opinion, we repeat, we are assuming, without deciding, that these findings of the trial court are correct.)
The court further held that E.A.B., in its credit check of C.E., Inc., had acquired information from which E.A.B. could have reasonably concluded that fraud had been committed by C.E., Inc. as the general partner of C.I., Ltd. On this basis the trial court concluded that the fraud in the underlying transaction (between the limited partners and the limited partnership, C.I., Ltd., through its general partner), permeated the entire letter of credit transaction. The trial court, necessarily, concluded that the underlying transaction was the "transaction" referred to in the 5-114(2) "fraud in the transaction" language and issued a preliminary injunction.
At this point we note that the precise question before this court (which "transaction" is meant by the phrase "fraud in the transaction" in R.S. 10:5-114(2) in a standby letter of credit situation), is res nova in Louisiana. Since this particular part of the Louisiana Commercial Law is taken from the U.C.C., we feel justified in considering cases from other jurisdictions in analyzing the questions raised in this case and in attempting to resolve this question in a way compatible with our sister states who have the same statutory language.
A broad and far-reaching examination of jurisprudence and commentary has been undertaken by this court. Pointed study and consideration has been given to judicial statements and scholarly assertions arising from other jurisdictions.
Our study has led to the conclusion, and we hold, that the "transaction" referred to in 5-114(2)'s "fraud in the transaction" phrase, is solely the letter of credit contract, or transaction, involving the issuing bank and the beneficiary of the letter of credit. Injunctions under 5-114(2) are a type of exception to the general rule of independent contract as set forth in 5-114(1).
While the precise rule before this court is res nova in Louisiana, there have been many cases which dealt with fraudulent conduct in situations involving conventional letters of credit and several involving injunctions being sought in standby letters of credit situations. These have been analyzed by counsel for the parties and this court.
*10 We note that the cases which have allowed an injunction to issue, in letters of credit cases in general, can be divided into two main classes. Both of these classes, or groups of cases, recognize the independent contract rule and limit those cases in which a finding of fraud in the "transaction" (between the beneficiary of the letter of credit and the issuer of the letter of credit) is made.
We will refer to the two groups of cases as the O'Grady cases and the Sztejn cases. The O'Grady cases basically say that, when a beneficiary presents fraudulent documents to an issuer there are sufficient grounds to enjoin payment under letters of credit held by the presenting beneficiary. The Sztejn cases hold that, when a seller/beneficiary practices fraud against a customer then that fraud will clothe, or infect, facially valid documents presented to an issuer, with fraud sufficient to support an injunction.
In O'Grady v. First Union Nat. Bank, 296 N.C. 212, 250 S.E.2d 587 (1978), the court discussed which "transaction" was intended to be considered when examining "fraud in the transaction." The court stated:
"Given the independence of the issuer's obligation to the beneficiary, and the commercial purposes which this independent obligation serves, it would appear that an injunction should issue to enjoin payment of a draft only in those instances where there is some action by the beneficiary which vitiates the transaction between the beneficiary and the issuer.... Since the transaction between the beneficiary and the issuer is one consisting of an exchange of documents, only some defect in these documents would justify an injunction against honor.
* * * * * *

"The Official Comment to G.S. 25-5-114 [the North Carolina equivalent of LSA-R.S. 10:5-114] gives little indication of the meaning of the term `fraudulent' document. Presumably such a document would be one that is completely forged or drawn up without any underlying basis in fact, one that is but partly spurious or a document which has been materially altered. ..." (Citations omitted.)
O'Grady, its ancestors and descendants, recognize that, under the independent contract rule, it is the "transaction between the beneficiary and the issuer" we are concerned with and they hold that, if the beneficiary presents fraudulent documents, this "vitiates the transaction between the beneficiary and the issuer," sufficient to support an injunction.
There has been no proof, or even allegation, in this case of any documentary fraud practiced by E.A.B. against any of the defendants. There can be no O'Grady-based injunction in this case.
The second class of cases springs from Sztejn v. J. Henry Schroder Banking Corp., 177 Misc. 719, 31 N.Y.S.2d 631 (Sup. Ct.1941), the case commonly accepted as the source of the "fraud in the transaction" language now found in 5-114(2). The plaintiffs rely heavily on Sztejn as support for their contention that fraud in the underlying transaction may serve as a basis for injunctive relief regardless of who perpetrated the fraud and regardless of who the beneficiary may be.
The plaintiffs further contend that, since R.S. 10:5-114(2) is a codification of Sztejn, the phrase "fraud in the transaction" refers to fraud in the underlying transaction as the basis for injunctive relief. We disagree.
In Sztejn, a customer in New York contracted to purchase bristles from a seller/beneficiary in India. At the request of the customer, the defendant bank issued a letter of credit to the Indian seller as beneficiary. The letter of credit required that drafts by the seller/beneficiary for the payment of the letter of credit be accompanied by an invoice and bill of lading showing that the merchandise ordered was shipped. Instead of shipping 50 crates of bristles as ordered, the Indian seller/beneficiary shipped 50 crates of worthless rubbish. *11 The documents presented by the seller/beneficiary represented that the proper merchandise was shipped.
Before the draft of the seller/beneficiary could be paid, the customer sued seeking to enjoin the issuing bank from paying the draft on the letter of credit on the ground of fraud committed by the seller/beneficiary; i.e., shipping rubbish instead of the merchandise ordered.
The issuing bank filed a motion to dismiss on the ground that the petition failed to state a cause of action; since the bank was only concerned with the documents presented by the seller/beneficiary and on their face they complied with the letter of credit requirements, the bank's position was that it could not legally concern itself with the underlying transaction under the established independent contract rule. The court recognized the independent contract rule but went on to say, "Of course, the application of this doctrine [the independent contract rule] presupposes that the documents accompanying the draft are genuine and conform to the requirements of the letter of credit."
The court further observed that, when an issuer of a letter of credit knows that the documents, although correct in form, are, in point of fact, false, it cannot be called upon to recognize such a document as complying with the terms of the letter of credit.
The letter of credit transaction in Sztejn was conventional; the three parties involved were the customer, the seller/beneficiary, and the issuing bank. The seller/beneficiary was actively committing a fraud upon the customer by shipping rubbish rather than the ordered merchandise. This active fraud by the seller/beneficiary resulted in the submission of documents (bills of lading and invoices) which, although correct in form, were in fact false and did not conform to the requirements of the letter of credit. This activity by the seller/beneficiary amounted to a delivery of fraudulent documents to the issuing bank; i.e., "fraud in the transaction" between the beneficiary and the issuer. (Because of the procedural posture of Sztejn it was presumed there had been fraud in the underlying transaction.)
In Sztejn there was active fraud committed by the seller in its relationship with the customer. Since the seller and beneficiary are one and the same person, the fraud committed by the seller clothed all documents with fraud that was presented by the seller as beneficiary and rendered them fraudulent when presented to the issuer.
In the case at hand, we have a standby letter of credit situation. The seller and beneficiary are two different parties involved in different capacities. In our case we have the seller (C.E., Inc.) as general partner of C.I., Ltd., the customer (plaintiffs), the issuing banks (defendants) and the beneficiary lending bank (E.A.B.). The trial court found fraud had been committed by the general partner in its activities with the investors in the underlying transaction. E.A.B. was not a party to activities between C.E., Inc. and the investors.
Plaintiffs argue that a finding of fraud in the underlying transaction is sufficient to support an injunction prohibiting a beneficiary from collecting under letters of credit issued pursuant to that underlying transaction and cite Sztejn to support their position. We have no quarrel with Sztejn as an appropriate rule where the beneficiary/seller committed active fraud rendering the documents fraudulent. However, the entry of a fourth party (beneficiary/lending bank) in this standby letter of credit situation, a party who gives value to obtain the letters of credit and who obtains them without fraudulent conduct on its part, justifies a different result.
The fact that E.A.B., in its credit check of C.E., Inc., acquired information on the activities of C.E., Inc. in the underlying transaction, which activities by C.E., Inc. could, at some later date, be declared fraudulent by a court, cannot serve as a basis for injunctive relief. The lending bank would be placed in the nebulous position of not only evaluating the credit reliability of its borrower, but the bank, after *12 considering its credit check information along with the very complex provisions of the PPM, would have to second-guess what a court ruling may be, at some later date, as to the classification of the conduct of the borrower (seller) in its dealing with the investor (customer). We can find no statutory law or jurisprudence that would place such an ambiguous burden upon the lending bank nor do we find any authority for issuing an injunction on this basis. It was error for the trial court to consider those circumstances as a basis for injunctive relief. A Sztejn -based injunction was improper.
As we apply the principles of Sztejn and O'Grady to the case at hand we conclude the trial court clearly erred in granting a preliminary injunction. The record does not support any active fraud having been committed by E.A.B. It is undisputed that the documents presented by E.A.B. to the issuing banks were in order and met the requirements of the letter of credit. There is no "fraud in the transaction" between E.A.B. and the issuing banks. Therefore, as we apply the independent contract rule, the judgment of the trial court must be reversed.
The narrow construction of 10:5-114, as we have expressed herein, represents the prevailing view of the courts of other jurisdictions. See Stringer Const. Co. v. American Ins. Co., 102 Ill.App.3d 919, 58 Ill.Dec. 59, 430 N.E.2d 1 (1st Dist.1981). We are aware that some courts have taken a broader view[3] resulting from their attempts to apply an equitable approach to letters of credit situations. A broad view or an application of the law of equity will lead to only one result; the demise of the letter of credit as a universal commercial tool.
The independence of the letter of credit from other contracts, arrangements and relationships involved in the underlying transaction, out of which the letter of credit arises, is the cornerstone of its utility.

"Encroachment of concepts that appropriately govern those other contracts, arrangements, and relationships does more than curtail the use and development of letters of credit. The rigid rules that govern letters of credit are structural. If they are subordinated to more pliable precepts appropriate to equitable resolution of disputes, the very existence of the letter of credit as a useful business device can be destroyed as surely as a wisteria vine can strangle an oak."[4]
Under the circumstances presented we shall reverse and dismiss the trial court judgment granting the preliminary injunction. Having come to this conclusion it is not necessary to discuss the remaining issues presented.
The appellants, European American Bank and Trust Company of New York, American Bank and Trust Company of Lafayette, and American Bank and Trust Company of Baton Rouge, sought damages and attorney's fees according to provisions of LSA-C.C.P. art. 3608.[5] This issue was not reached by the trial court, thus, it is necessary that we remand the case to the trial court for the limited purpose of considering whether damages and attorney's fees should be awarded, and if so, the amount.
For the reasons set forth, the judgment of the trial court, granting the preliminary injunction, is reversed and set aside. The suit is hereby remanded for the limited purpose of considering appellants' request *13 for damages and attorney's fees according to the provisions of LSA-C.C.P. art. 3608.
Plaintiff-appellee is to pay all costs of the trial court and for this appeal.
REVERSED AND REMANDED IN PART.
PER CURIAM.
Combined Investments, Ltd., intervenor, through its general partner, Combined Equities, Inc., filed an application for a rehearing requesting that we amend that portion of our judgment which remanded the suit for the limited purpose of considering appellants' request for damages and attorney's fees according to LSA-C.C.P. art. 3608. Combined Investments was not included in the remand. The record, as presented to us, reflected that Combined Investments' appeal was not perfected due to the failure to pay appeal costs. After we received this application, we found that the record was in error.
This error occurred as follows: The district court clerk originally sent the notice of the estimated appeal costs to Combined Investments' original attorney, failing to note that there had been a change of counsel. The appeal costs were not paid and, when the record was filed with this court, there was written on the face of Combined Investments' motion for an appeal, the following: "Abandoned due to failure to pay costs." The district court clerk later found that the notice of costs was sent to the wrong counsel. The estimated costs were then presented to the proper counsel; the same were paid to the district clerk. The appeal was thus perfected and corrections were made by the clerk. However, these corrections were either not forwarded to us or were lost in transit; in any event, they failed to get into the record. The check for costs, which the clerk sent to cover Combined Investments' appeal, was improperly credited by our clerk's office and thus no evidence existed on the face of the record before us to show that Combined Investments' appeal had actually been perfected. Thus, the appeal was erroneously not considered by us. We now, however, consider the appeal perfected.
For the reasons above, the application of Combined Investments, Ltd. is granted and that portion of our judgment, remanding the suit for the limited purpose of considering appellants' request for damages and attorney's fees, according to LSA-C.C.P. art. 3608, is hereby amended to include a consideration of the request of Combined Investments, Ltd. for damages and attorney's fees.
In all other respects, the judgment rendered by this court is to remain unchanged.
APPLICATION GRANTED AND JUDGMENT AMENDED.
NOTES
[1] These "units" were purchased by individuals, groups of individuals and partnerships formed for this purpose. The purchaser/investors, the limited partners of C.I., Ltd., are the plaintiffs herein.
[2] American Bank-Baton Rouge had issued letters of credit for the account of some investors which letters of credit were secured by letters of credit issued by the American Bank-Lafayette. The effect of the preliminary injunction was to not only enjoin E.A.B. from drafting on letters of credit held by it, but also American Bank-Lafayette was enjoined from honoring the letters of credit which secured the letters of credit issued by American Bank-Baton Rouge.

Defendant, Hub City Bank and Trust Company, of Lafayette, Louisiana, appealed but filed no brief.
[3] Dynamics Corp. of Amer. v. Citizens & Southern Nat. Bank, 356 F.Supp. 991 (N.D.Ga.1973).
[4] Harfield, Identity Crises in Letters of Credit Law, 24 Ariz.L.Rev. 239 (1982).
[5] LSA-C.C.P. article 3608 provides:

"The court may allow damages for the wrongful issuance of a temporary restraining order or preliminary injunction on a motion to dissolve or on a reconventional demand. Attorney's fees for the services rendered in connection with the dissolution of a restraining order or preliminary injunction may be included as an element of damages whether the restraining order or preliminary injunction is dissolved on motion or after trial on the merits."