IN THE SUPREME COURT OF NORTH CAROLINA

No. 225PA21-2

Filed 13 December 2024

NORTH STATE DELI, LLC d/b/a LUCKY'S DELICATESSEN; MOTHERS & SONS, LLC d/b/a MOTHERS & SONS TRATTORIA; MATEO TAPAS, L.L.C. d/b/a MATEO BAR DE TAPAS; SAINT JAMES SHELLFISH LLC d/b/a SAINT JAMES SEAFOOD; CALAMARI ENTERPRISES, INC. d/b/a PARIZADE; BIN 54, LLC d/b/a BIN 54; ARYA, INC. d/b/a CITY KITCHEN and VILLAGE BURGER; GRASSHOPPER LLC d/b/a NASHER CAFE; VERDE CAFE INCORPORATED d/b/a LOCAL 22; FLOGA, INC. d/b/a KIPOS GREEK TAVERNA; KUZINA, LLC d/b/a GOLDEN FLEECE; VIN ROUGE, INC. d/b/a VIN ROUGE; KIPOS ROSE GARDEN CLUB LLC d/b/a ROSEWATER; and GIRA SOLE, INC. d/b/a FARM TABLE and GATEHOUSE TAVERN

v.

THE CINCINNATI INSURANCE COMPANY; THE CINCINNATI CASUALTY COMPANY; MORRIS INSURANCE AGENCY INC.; and DOES 1 THROUGH 20, inclusive

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 284 N.C. App. 330 (2023), reversing an order entered on 9 October 2020 by Judge Orlando F. Hudson Jr. in Superior Court, Durham County, and remanding the case. Heard in the Supreme Court on 22 October 2024.

*The Paynter Law Firm, PLLC, by Gagan Gupta and Stuart M. Paynter, for plaintiff-appellants.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Kimberly M. Marston, Jim W. Phillips Jr., and Gary S. Parsons; and Litchfield Cavo, LLP, by Daniel G. Litchfield, pro hac vice, and Alan I. Becker, pro hac vice, for defendant-appellees.*

*Joshua H. Stein, Attorney General, by Ryan Y. Park, Solicitor General, and Kaeli Czosek, Solicitor General Fellow, for the State of North Carolina, amicus curiae.*

*Robinson, Bradshaw & Hinson, P.A., by Richard C. Worf Jr.; and Covington & Burling LLP, by Rukesh A. Korde, pro hac vice, and Tyler Weinblatt, pro hac vice, for United Policyholders and National Independent Venue Association, amici curiae.*

*Guy W. Crabtree for North Carolina Restaurant & Lodging Association, Restaurant Law Center, and Angus Barn, Inc., amici curiae.*

*Office of the City Attorney for the City of Durham, by Kimberly M. Rehberg; and Patrick W. Baker, Adam M. Jones, Rhonda D. Orin, pro hac vice, Marshall Gilinksy, pro hac vice, and Madilynne Lee, pro hac vice, for Cities of Charlotte and Durham, amici curiae.*

*Roger A. Peters II for American Property Casualty Insurance Association, amicus curiae.*

EARLS, Justice.

Plaintiffs are bars and restaurants in North Carolina (collectively, restaurants) that were forced to suspend business operations because of COVID-19-related orders by government authorities.[1] When the global pandemic struck in the spring of 2020, each restaurant carried a materially similar commercial property insurance policy with defendants Cincinnati Insurance Company and Cincinnati Casualty Company (together, Cincinnati). Those policies protect the businesses' building and personal property as well as business income from any "direct physical loss" to property not excluded by the policy. The dispute here is whether a "direct

---

[1] They are Lucky's Delicatessen, Mothers & Sons Trattoria, Mateo Bar de Tapas, Saint James Seafood, Parizade, Bin 54, City Kitchen, Village Burger, Nasher Cafe, Local 22, Kipos Greek Taverna, Golden Fleece, Vin Rouge, Rosewater, Farm Table, and Gatehouse Tavern. These restaurants and bars are based in Buncombe, Chatham, Durham, Orange, and Wake counties. The parent companies of those businesses are the plaintiff parties.

physical loss" occurred when government orders forced temporary restrictions on the use of and access to the restaurants' physical property.

Cincinnati argues that these temporary physical closures are not the type of direct "loss" contemplated by the policy and refuses liability for coverage. The restaurants argue that these closures are a covered property "loss" under the policy's ordinary meaning and seek a declaratory judgment to that effect.

Below, the trial court sided with the restaurants, finding on a motion for partial summary judgment that such losses are covered. The Court of Appeals then reversed that order, interpreting the insurance contract to exclude such losses, and remanded the case, directing the trial court to enter summary judgment in favor of defendants. *N. State Deli, LLC v. Cincinnati Ins. Co.*, 284 N.C. App. 330, 334 (2022). We disagree with the Court of Appeals based on our Court's long-standing rules of insurance contract interpretation. Because a reasonable policyholder in the restaurants' shoes could expect "direct physical loss" to property, as used in this policy, to include the results of COVID-19-era government orders which affected the restaurants' use of and access to their physical property, and because the policy otherwise contains no exclusion for viruses, we construe the ambiguity here in favor of coverage. Accordingly, we hold that this policy does cover the restaurants' alleged losses and that the restaurants are entitled to their motion for partial summary judgment. We therefore reverse the judgment of the Court of Appeals and remand to the Court of Appeals for further remand to the trial court for further proceedings

consistent with this opinion.

## I. Background

### A. Government orders issued in response to COVID-19 forced covered establishments to suspend business operations.

"A ruling on a motion for summary judgment must consider the evidence in the light most favorable to the non-movant, drawing all inferences in the non-movant's favor." *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 680 (2018). Undisputed evidence submitted during discovery showed the following: starting in March of 2020, state and local governments responded to the COVID-19 public health crisis with multiple orders aimed at stopping the virus's spread. *See, e.g.*, Exec. Order No. 141, 34 N.C. Reg. 2360 (May 20, 2020). The orders imposed broad limitations on the use and operation of a variety of business properties across the state. Relevant here, they forced owners and employees of bars and restaurants to close or curtail business operations. For example, varying state orders limited the sale of food and beverages "to carry-out, drive-through and delivery services only" and limited access to facilities that sell food and beverages accordingly. *See, e.g.*, Exec. Order No. 118, 34 N.C. Reg. 1834 (Mar. 17, 2020). Bars with no food service were closed outright. *See id.* Later orders kept restaurants closed except for preparing food for off-premises consumption, *see* Exec. Order No. 120, 34 N.C. Reg. 1844 (Mar. 23, 2020), and established social distancing and occupancy limits as time progressed, *e.g.*, Exec. Order No. 131, 34 N.C. Reg. 1960 (Apr. 9, 2020). These state orders were enforced by threat of criminal prosecution. *E.g., id.* at 1968.

Local or municipal orders supplemented these statewide measures. For example, the City of Durham, where at least some of the restaurants are or were located, prohibited travel to or engagement in business activities with enumerated exceptions, including that restaurants were permitted to prepare and serve food for off-premises consumption only.

The restaurants offered evidence that these mandated closures, use restrictions, and corresponding declines in business income caused the businesses to furlough and lay off their employees and even risk having to close permanently. Sixteen of the restaurants closed completely after the orders, and two remained open for take-out only before closing for business in May 2020 for a period of time. After the pandemic, at least one of the restaurants (Lucky's Delicatessen) never reopened.

**B. The restaurants maintained an "all-risk" commercial property insurance policy and supplemental business income coverage.**

At the time of these forced closures, the restaurants carried an "all-risk" commercial property insurance policy and supplemental business income policy with Cincinnati. "All-risk" or "open-perils" insurance is a type of property insurance that protects property loss or damage from any peril, unless the peril is expressly excluded. *See Open-Perils Insurance*, Black's Law Dictionary (12th ed. 2024). It is more protective for insureds because it covers imagined and unimagined perils, so a business need not guess in advance what misfortune might befall it. *See Avis v. Hartford Fire Ins. Co.,* 283 N.C. 142, 146 (1973). The policy is also structured to allow insurance companies to carve out certain events from coverage, including those not

conducive to risk-spreading across the pool of insureds. Erik S. Knutsen & Jeffrey W. Stempel, *Infected Judgment: Problematic Rush to Conventional Wisdom and Insurance Coverage Denial in a Pandemic*, 27 Conn. Ins. L.J. 185, 194–95 (2021). In addition to excluded perils, an "all-risk" or "open-perils" policy is further limited by what types of losses are actually covered—as in, the type of property "damage" or "loss" triggering coverage under a commercial property insurance policy. *See Avis*, 283 N.C. at 146 (noting that "all risks" does not include "all losses").

A hypothetical to clarify this risk/loss distinction: If an alien spaceship crashes into a small restaurant, that is a covered risk (aliens are not an excluded cause of loss) and a covered loss (the commercial building is damaged). If an alien spaceship dumps glitter all over the restaurant, that is a covered risk (aliens are not excluded), but the insurance company likely could successfully contend that is not a covered loss (the owner can vacuum up the glitter, and the building is fine). A policyholder is entitled to coverage if they experience both a covered "risk" and a qualifying "loss."

The restaurants here have such "all-risk" policies for which they have paid tens of thousands of dollars in premiums. Specifically, they each have a commercial property insurance policy that insures building and personal property from direct physical loss or damage caused by a covered cause of loss—that is, all causes of loss that are not specifically excluded. They also have a "Business Income (and Extra Expense) Coverage" supplement insuring against lost business income sustained

when the business must suspend its operations because of a covered loss.[2]

Starting with the property insurance policy, it says the following: "We will pay for direct 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss." The quotations denote a term defined in the policy. According to the definitions section, " 'Loss' means accidental physical loss or accidental physical damage." But the policy does not define "physical loss," "physical damage," or "accidental," even as it defines dozens of other terms across three pages of definitions.

The policy confirms that it is an "all-risk" policy by defining the scope of its risk coverage only by its exclusions: Covered Causes of Loss means "direct 'loss' unless the 'loss' is excluded or limited in this Coverage Part." The excluded Causes of Loss span six pages. Examples include: earthquakes; an ordinance or law that regulates construction, use, or repair of any building or structure; war or military action; certain kinds of flooding or mudslides; fungi; wear and tear; dishonest or criminal acts; exposure to weather; and pollutants of certain kinds.

Notably, viruses or contaminants are not excluded. On the contrary, one of the restaurants' owners and operators, Matthew Raymond Kelly, alleged that he expressly requested that his insurance broker ensure that the policies provide coverage for losses due to viruses, given his knowledge of a previous norovirus

---

[2] Although there are multiple policies at issue across the multiple restaurants, the operative language is the same in each, and therefore, we refer to North State Deli's policy, attached as an exhibit to Matthew Raymond Kelly's affidavit.

outbreak among North Carolina restaurants. (The broker, Morris Insurance Agency, Inc., is a defendant in this action.) The broker allegedly indicated that the policy *would* cover virus-related events —the very policy under which the restaurants now seek coverage.

The specific provision under which the restaurants seek coverage is the supplemental "Business Income (And Extra Expense) Coverage Form." It stipulates:

> We will pay for the actual loss of "Business Income" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct "loss" to property at "premises" . . . . The "loss" must be caused by or result from a Covered Cause of Loss.

Loss here is defined the same way as above ("accidental physical loss or accidental physical damage"). A "suspension" means, in relevant part, a "slowdown or cessation of . . . business activities." The period of restoration is defined as:

> a. Begins at the time of direct "loss".
>
> . . . .
>
> b. Ends on the earlier of:
>
>> (1) The date when the property at the "premises" should be repaired, rebuilt or replaced with reasonable speed and similar quality;
>>
>> (2) The date when business is resumed at a new permanent location; or
>>
>> (3) 12 consecutive months after the date of direct "loss".

Putting together this web of provisions, the restaurants are entitled to recover

insurance payments for the slowdown or cessation of business activities if their losses stemming from the government-ordered shutdowns are a "direct" "physical loss or . . . physical damage" to property caused by a covered risk.

## C. The trial court sided with the restaurants, and the Court of Appeals reversed.

Because they were concerned Cincinnati would deny coverage for their claimed losses, the restaurants filed suit in 2020. At issue here is the restaurants' claim for a declaratory judgment that gubernatorial, county, and municipal orders constitute covered perils under the policies that caused "direct physical loss" to property at the described premises and that Cincinnati must therefore pay the resulting lost business income and extra expenses as defined by the polices. The restaurants moved for partial summary judgment on that count on 3 August 2020.

The trial court agreed with the restaurants and granted their motion. Because Cincinnati did not define "direct" "physical loss" or "physical damage" in the policy, the court reasoned, those words must be given their ordinary meaning. The ordinary meaning of "loss," it noted, includes the "act of losing possession." "Direct" and "physical" connote a causal relationship between a source and a material object. It further noted that "or" in "physical loss or . . . physical damage" suggests "loss" cannot also require structural alteration to property or else "damage" would be rendered meaningless. Moreover, it determined that since the policy does not exclude the cause of the restaurants' losses, government shutdowns due to a virus must be included.

At the Court of Appeals, a unanimous panel reversed the trial court's order.

While noting that the goal of insurance contract interpretation is to arrive at the coverage intended by the parties and that any ambiguities are to be construed against the insurer, it concluded that no "direct physical loss of or damage to" property occurs from loss of use of or access to property. *N. State Deli*, 284 N.C. App. at 333. Since there was no physical harm to property, only "loss of business," partial summary judgment in favor of the restaurants was error. *Id.* at 333–34. The restaurants filed a petition for discretionary review, and the Court allowed the petition.

## II.    Analysis

### A. Standard of Review

"Our standard of review of an appeal from summary judgment is de novo." *Kimberley Rice Kaestner 1992 Fam. Tr. v. N.C. Dep't of Revenue*, 371 N.C. 133, 137 (2018) (quoting *In re Will of Jones*, 362 N.C. 569, 573 (2008)), *aff'd sub nom. N.C. Dep't of Revenue v. Kimberley Rice Kaestner 1992 Fam. Tr.*, 588 U.S. 262 (2019). Summary judgment is appropriate when "the record shows that 'there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.' " *In re Will of Jones*, 362 N.C. at 573 (quoting *Forbis v. Neal*, 361 N.C. 519, 523–24 (2007)). The meaning of language in an insurance policy presents a question of law for the Court. *Accardi v. Hartford Underwriters Ins. Co.*, 373 N.C. 292, 295 (2020).

A dispute regarding coverage under an insurance policy is properly resolved on summary judgment "where the material facts and the relevant language of the

policy are not in dispute and the sole point of contention is 'whether events as alleged in the pleadings and papers before the court are covered by the policies.' " *N.C. Farm Bureau Mut. Ins. Co. v. Martin ex rel. Martin*, 376 N.C. 280, 285 (2020) (quoting *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 690–91 (1986)).

Cincinnati does not contest the restaurants' factual allegations, nor does it argue that any exclusions apply that preclude coverage. Its sole contention is that the restaurants have failed to carry their burden to establish that their businesses had to suspend operations because of a direct physical loss or damage to property. Since the dispute over the restaurants' claim for a declaratory judgment turns only on the interpretation of "direct" "physical loss or . . . physical damage" to property as used in the policy, we agree that this claim is properly resolved at summary judgment.

## B. Rules of Insurance Contract Interpretation

As with all contracts, the goal of interpreting a contract for insurance "is to arrive at the intent of the parties when the policy was issued." *Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 505 (1978). In doing so, "the plain language of the policy controls." *N.C. Farm Bureau Mut. Ins. Co.*, 376 N.C. at 286. Terms that are defined in a policy should be given that definition. *Woods*, 295 N.C. at 505–06. Undefined words are given their ordinary meaning consistent with the context in which the term is used. *Accardi*, 373 N.C. at 295. One way of understanding ordinary meaning is to consult standard, nonlegal dictionaries. *N.C. Farm Bureau Mut. Ins. Co.*, 376 N.C. at 287. Terms should also be interpreted in harmony with other portions of the policy,

if possible, and to give effect and purpose to each word or term. *Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348, 355 (1970).

In addition to these general rules for contract interpretation, special interpretive principles apply when interpreting contracts for insurance, as our Court has long recognized. *E.g. Jones v. Cas. Co.*, 140 N.C. 262, 263–65 (1905). Namely, the insurance contract "should be given that construction which a reasonable person in the position of the insured would have understood it to mean." *Grant v. Emmco Ins. Co.*, 295 N.C. 39, 43 (1978); *accord Wachovia Bank & Tr. Co.*, 276 N.C. at 356 (noting that undefined terms should be given the "meaning most favorable to the insured which is consistent with the use of the term in ordinary speech"); *Register v. White*, 358 N.C. 691, 699 (2004). Where a policy term is ambiguous, because "the language is 'fairly and reasonably susceptible to either of the constructions for which the parties contend,'" it should be construed against the insurance company and in favor of the policyholder. *Accardi*, 373 N.C. at 295 (quoting *Wachovia Bank & Tr. Co.*, 276 N.C. at 354); *accord Brown v. Lumbermens Mut. Cas. Co.*, 326 N.C. 387, 392 (1990). Subject to those principles of construction, provisions granting coverage must be read expansively, and provisions excluding coverage must be read narrowly. *Wachovia Bank & Tr. Co.*, 276 N.C. at 355.

These basic principles reflect the reality of the parties' respective bargaining power: insurance companies prepare the policies and choose what language to use. *See Grant*, 295 N.C. at 43. They are also experienced in managing risk and drafting

policies accordingly. *Cf. Infected Judgment*, at 194–95 (describing insurance as a "risk-based product, designed to buffer chance happenings of loss-related events by pooling collective risk" and noting some considerations in structuring and pricing insurance polices in light of possible pandemic-related losses). This Court will not impose on an insurance company liability it did not assume and for which the policyholder did not pay. *Accardi*, 373 N.C. at 295. But insurance companies have ample notice of these longstanding interpretive principles, which set clear " 'rules of engagement' for novel arguments" on which all parties can rely. *See* New Appleman North Carolina Insurance Law §§ 1.03, 1.05 (2024 ed. 2023) (noting that insurance disputes are governed by "basic principles [that] have been invoked by the courts time and again," including that provisions that provide coverage are construed liberally and ambiguities are resolved against the insurer); 18 Strong's North Carolina Index 4th, Insurance § 124 (2014) (compiling cases). Such rules of engagement are a useful interpretive tool to ensure efficient dispute resolution and are consistent with our approach to other kinds of contract interpretation. *See O'Grady v. First Union Nat'l Bank*, 296 N.C. 212, 227 (1978) (describing the general rule of contract interpretation that ambiguities are construed against the drafting party).

Put simply, because of these rules, insurance companies know they must clearly "mark out and designate" the contours of their policy and that "it is not the function of the court to sprinkle sand upon the ice by strict construction of the [otherwise slippery] term." *Jamestown Mut. Ins. Co. v. Nationwide Mut. Ins. Co.*, 266

N.C. 430, 437 (1966). If, in applying these background principles, coverage expands beyond what the company says it contemplated, then "the fault lies in its own selection of the words by which it chose to be bound." *Id.* at 438.

## C. Application to the Restaurants' Policies

The issue here is whether the phrase "direct" "physical loss" to property as it is used in the restaurant's policies covers their loss of physical use of and access to their property due to virus-related government orders.

Again, the policy does not define this operative term. "Loss" is defined as "accidental physical loss or accidental physical damage," but none of those constituent phrases are defined among the dozens of definitions in the policy. "Accidental" is part of this definition, but it is not contested here. Our task then is to interpret the ordinary meaning of "direct physical loss" in the context of this policy.

We start by consulting relevant definitions in standard, nonlegal dictionaries. *See N.C. Farm Bureau Mut. Ins. Co.*, 376 N.C. at 287. "Direct" is characterized by "a close esp[ecially] logical, causal, or consequential relationship" or marked by the "absence of an intervening agency, instrumentality, or influence." *Direct*, Webster's Third New International Dictionary 640 (2002). "Physical" means material, as opposed to mental, moral, spiritual, or imaginary. *Physical*, Webster's Third New International Dictionary 1706. "Loss" means a deprivation, failure to keep possession, or the state or fact of being destroyed. *Loss*, Webster's Third New International

Dictionary 1338.[3] Put together, a covered cause of loss must, absent an intervening factor, result in the material deprivation, dispossession, or destruction of property.

Both parties make reasonable arguments about whether that ordinary meaning includes closures due to government orders. The restaurants argue that the orders did immediately result in material deprivation of property. The orders targeted individual conduct on the property, the functions of the property, and how policyholders could physically access and occupy the insured space, including whether and under what conditions the business premises could be open. *See, e.g.*, Exec. Order No. 120, 34 N.C. Reg. 1844 (Mar. 23, 2020). That in turn affected the feasibility of business operations. It is true that these restrictions were temporary, but there is no "total" or "partial" modifier that excludes temporary property restrictions from coverage.

Cincinnati counters that "direct physical loss" cannot simply mean "loss of physical use." By analogy, it points out that "loss of a car" does not mean the same thing as "loss of use of a car," as any grounded teenager could confirm, quoting *Image Dental, LLC v. Citizens Ins. Co. of Am.*, 543 F. Supp. 3d 582, 590–91 (N.D. Ill. 2021). Extending that logic, it notes that the COVID-19 virus and corresponding

---

[3] Ironically, Webster's Third also defines "loss" as "the amount of an insured's financial detriment due to the occurrence of a stipulated contingent event (as death, injury, destruction, or damage) in such a manner as to charge the insurer with a liability under the terms of the policy," which if applied here renders the policy totally circular. *Loss*, Webster's Third New International Dictionary 1338.

government orders regulated the activities of people, not property, and that the restaurants experienced no physical change to the business property itself.

Contrary to Cincinnati's arguments, though, we fail to see why the ordinary meaning of "direct physical loss" is entirely insensitive to the "use" for which a property is insured. Again, by analogy, the homeowner who cannot live in their house due to irremediable cat urine odor is not placated that their property is not "lost" because it could be used as a home for cats. *See Mellin v. N. Sec. Ins. Co.*, 115 A.3d 799, 805 (N.H. 2015) (concluding that "physical loss to property" could include loss resulting from persistent cat urine odor which rendered a property "temporarily or permanently unusable or uninhabitable"). This overlap between property "use" and "loss" follows from a contextual and common-sense expectation that insurance should protect from threats to property that make it unusable for the purpose for which it is insured. Property "loss" surely occurs when it is no longer usable for its insured purpose, as a policyholder would reasonably expect. Thus when the restaurants lost physical use of their properties as restaurants due to the pandemic orders, they experienced a direct physical loss.

Can harmonizing the phrase "direct physical loss" with other policy provisions clarify its contours? We note, as the trial court below did, that "direct physical loss" is used in conjunction with "direct physical damage," so "loss" must have some meaning distinct from "damage" to effectuate both provisions. *See also C.D. Spangler Constr. Co. v. Indus. Crankshaft & Eng'g Co.*, 326 N.C. 133, 142 (1990). "Damage" is

defined as "injury or harm to . . . property." *Damage*, Webster's Third New International Dictionary 571. The distinct meaning of "loss" could be one of degree, as Cincinnati argues: "loss" is complete destruction or total dispossession, as in an instance of theft, while "damage" is a less-than-complete impairment or alteration. That reading would exclude temporary restrictions under the pandemic-era government orders that barred access to or use of restaurant dining rooms but not the restaurants' entire premises. Alternatively, a reasonable policyholder could see these two words in the disjunctive and read "loss" as purposely broader than "damage." A broader definition could encompass dispossession, deprivation, or impairment of use or function, complete or partial. That would include temporary dispossession or deprivation of the businesses' physical property under government orders, as the restaurants argue.

It is not obvious from the conjunction "or" which of these two distinct yet overlapping meanings the parties intended. But a "reasonable person in the position of the insured" could certainly read the provision to include the latter, and the ambiguity counsels us to find in favor of the restaurants' reading. *See Grant*, 295 N.C. at 43.

Looking yet further to neighboring language in the policies, Cincinnati urges that the provision indicating the duration for which it will provide insurance benefits after the property loss or damage, called the "period of restoration," should color the meaning of "direct physical loss" in the policy. Assuming without deciding that a

reasonable insured would look to a provision on the duration of coverage to understand the scope of the coverage, the ordinary meaning of the "period of restoration" here again supports both parties' constructions.

The provision in the restaurants' policies about the "period of restoration" states that it runs through one of three disjunctive alternatives: the date by which the property should be repaired, rebuilt, or replaced; the date when business is resumed at a new permanent location; or twelve consecutive months after the direct physical loss or damage. Cincinnati points out that the indemnity ends "on the earlier of" the three alternatives. Necessarily then, a policyholder must know exactly how long each alternative takes, so all losses must be capable of complying with all three alternatives, it argues. That implies direct physical losses are only those that can be "repaired, rebuilt or replaced," it says.

But that conclusion does not follow as a matter of ordinary meaning, rooted in the reasonable understanding of the insured. If a policy gives two alternatives and says the "earlier" is operative, and one is clearly inapplicable, the "earlier" is the only applicable one. The insured does not lose coverage because the "loss" cannot be restored under both alternatives.[4] Same, here. If two of the three options (resuming

---

[4] Consider the instant policy, putting aside the temporal alternative of twelve consecutive months. One restoration end-date is when the property at the premises "should be repaired, rebuilt or replaced." The other is "[t]he date when business is resumed at a new permanent location." It is clear a policyholder would not comply with both. For example, if escaped radioactive waste from a nuclear powerplant renders the next-door restaurant completely inoperable, then the restaurant policyholder may not have the option to rebuild, repair, or replace its lost property. She would need to move to a new permanent location. And

at a new permanent location or repairing, rebuilding, or replacing the lost property) do not apply, a reasonable policyholder would expect the twelve-consecutive-month limit to be the "earliest" and thus controlling option. And that temporal limit says nothing as to the contours of a "direct physical loss."

Looking even further, the varying "exclusions" from covered causes of loss underscore that the restaurants reasonably expected their losses in these circumstances to be covered. Because the policy excludes certain kinds of government zoning regulations, government ordinances, government seizures, and war and military actions, a person in the insured's shoes could reasonably expect virus-related government orders that are *not* an excluded cause of loss to be covered under the policy.

Notably, too, the restaurants' policies contain no exclusions for viruses in general, even as 82.83% of business insurance policies had such exclusions.[5] Cincinnati may dismiss the existence of virus exclusions in other policies as extratextual, but where a contract defines coverage only by excluded risks, as this one does, a policyholder must know something about the universe of perils beyond the four corners of the document to know what coverage they have paid for.

---

the time it takes to resume at that new permanent location would be the "earliest" and thus operative period of restoration.

[5] This figure is according to one insurance industry data measure. *See* Nat'l Ass'n of Ins. Comm'rs, COVID-19 Property & Casualty Insurance Business Interruption Data Call, Part 1, Premiums and Policy Information, at 3 (June 2020), https://content.naic.org/sites/default/files/inline-files/COVID-19%20BI%20Nat%27l%20Aggregates_2.pdf (last visited Dec. 10, 2024).

Further, concerns about viruses and their consequences for business operations were common enough in the restaurant industry that at least one restaurant specifically sought coverage for such losses under the instant policy. Knowledge of the risks of viruses, together with knowledge that other policies exclude virus risks while this one does not, underscores that a policyholder would reasonably understand the absence of such an exclusion as an affirmative grant of coverage. *See Grant*, 295 N.C. at 43. This conclusion is further supported by the allegation that the restaurants' insurance broker apparently shared this interpretation of the policy.

Finally, at the highest level of context, Cincinnati emphasizes that this is a commercial property insurance policy. It is not insurance against lost profits, which it says follows from the restaurants' reading of "direct" "physical loss" to property. But the restaurants counter that they seek coverage not under the first-level property insurance policy—rather their claim is under the supplemental business income coverage form. A policyholder may reasonably believe that "they purchased business interruption insurance as an add-on to their property coverage in order to insure a capital asset—the income-earning power of their business." *Infected Judgment*, at 199. If that capital asset "is interrupted due to an interference with their use of the property[,] . . . their reasonable expectation would be that the business interruption portion of their policy would cover such losses," especially since the interruption coverage relates to the "all-risk" property insurance for which viruses and corresponding orders are not excluded. *See id.* That is a particularly reasonable

expectation for a restaurant policyholder, since restaurants are accustomed to operating on razor-thin margins and can only do business with use of their physical space.

Cincinnati, again, could have provided a narrower definition of "direct physical loss" for this business income coverage. It did not. Instead, it opted only to restate its non-definition: " 'Loss' means accidental physical loss or accidental physical damage." Of course, the more definitions there are, the longer contracts become, and the more difficult they can be for an ordinary policyholder to understand. But an insurance company need not define every term in its policy to define the core provision around which the entire policy operates.

At bottom, a reasonable person in the position of the insured would understand the restaurants' policies to include coverage for business income lost when virus-related government orders deprived the policyholder restaurants of their ability to physically use and physically operate property at their insured business premises. Since Cincinnati's interpretation of "direct physical loss" to property is also reasonable, North Carolina's background principles compel us to resolve this ambiguity in favor of the insured policyholder. *See Accardi*, 373 N.C. at 295. We therefore conclude that the restaurants have stated a claim for coverage due to a "direct physical loss" to property under their policies, and they are entitled to partial summary judgment as the trial court concluded.

In so holding, we decline to do what other courts have done and affirmatively define the "slippery" term Cincinnati chose to use in this manifestly ambiguous situation. *See Jamestown*, 266 N.C. at 437; *see also Schleicher & Stebbins Hotels, LLC v. Starr Surplus Lines Ins. Co.*, 302 A.3d 67, 77 (N.H. 2023) (cautioning against an overly broad judicial interpretation of "direct physical loss"). We are aware of the opinions by other courts holding the opposite of what we hold today. But the array of definitions offered in those opinions underscores that "direct physical loss" has a range of reasonable interpretations—many of which include considerations of use, possession, and function that are implicated by virus-related government orders. *See, e.g.*, *Ungarean v. CNA & Valley Forge Ins. Co.*, 323 A.3d 593, 607–08 (Pa. 2024) (concluding that "direct physical loss . . . of property" requires "a physical disappearance, partial or complete deterioration, or absence of a physical capability or function of the property"); *Huntington Ingalls Indus., Inc. v. Ace Am. Ins. Co.*, 287 A.3d 515, 529 (Vt. 2022) (concluding that "direct physical loss" means "persistent destruction or deprivation, in whole or in part, with a causal nexus to a physical event or condition"); *Starr Surplus Lines Ins. Co. v. Eighth Jud. Dist. Ct.*, 535 P.3d 254, 262 (Nev. 2023) ("[D]irect physical loss to covered property requires material or tangible destruction or dispossession as a result of material or tangible impact directed toward the property itself." (cleaned up)); *Cajun Conti LLC v. Certain Underwriters at Lloyd's,* 2022-01349 (La. 3/17/23), 359 So. 3d 922, 926 ("[D]irect physical loss . . . requires [that a] property sustain a physical, meaning tangible or corporeal, loss or

damage [or otherwise become uninhabitable].”); *Conn. Dermatology Grp., PC v. Twin City Fire Ins. Co.*, 288 A.3d 187, 198 (Conn. 2023) (“[D]irect physical loss of property . . . [requires] some physical, tangible alteration to or deprivation of the property that renders it physically unusable or inaccessible.” (cleaned up)); *Another Planet Ent., LLC v. Vigilant Ins. Co.*, 548 P.3d 303, 307 (Cal. 2024) (“[D]irect physical loss or damage to property . . . must result in some injury to or impairment of the property as property.”).

North Carolina’s background rules of insurance contract interpretation counsel against this approach. It is the insurance company’s responsibility to define essential policy terms and the North Carolina courts’ responsibility to enforce those terms consistent with the parties’ reasonable expectations. *See Grant*, 295 N.C. at 43. Otherwise, insurance companies are licensed to pitch consumers on an expansive, “all-risk” policy, while hiding behind a narrower definition imposed by judicial fiat when it comes time to pay out. Such a setup contradicts our Court’s holdings that the lodestar for insurance contract interpretation is the reasonable expectation of the policyholder and that ambiguities should be resolved in the insured’s favor.

### III.   Conclusion

In light of the above, we cannot say that the restaurants’ policies unambiguously bar coverage when government orders and threatened viral contamination deprived the policyholder restaurants of their ability to physically use and physically operate property at their insured business premises. Accordingly, the

policyholder restaurants have stated a claim for coverage and are entitled to their claim for partial summary judgment. We reverse the judgment of the Court of Appeals and remand this case to the Court of Appeals for further remand back to the trial court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.